**AMERICA ONLINE, INC., Plaintiff,**

v.

**NATIONAL HEALTH CARE DISCOUNT, INCORPORATED, Defendant.**

**No. C98–4111–PAZ.**

United States District Court, N.D. Iowa, Western Division.

Sept. 29, 2000.

Richard A. Malm, Bret Alan Dublinske, Dickinson Mackaman Tyler & Hagen, P.C., Des Moines, Iowa, for plaintiff.

Daniel L. Hartnett, Crary–Huff–Inkster–Hecht–Sheehan–Ringenberg–Hartnett–Storm, Sioux City, Iowa, for defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

ZOSS, United States Magistrate Judge.

### TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1258

II. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1259

III. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268
 A. Choice of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1268
 B. Standards for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . 1270
 C. AOL's Claim Under the CFAA . . . . . . . . . . . . . . . . . . . . . . . . . . 1271
 D. AOL's Claim Under the Virginia Computer Crimes Act . . . . . . . 1276
 E. AOL's Claim for Trespass to Chattels . . . . . . . . . . . . . . . . . . . . 1277
 F. AOL's Claims of Civil Conspiracy . . . . . . . . . . . . . . . . . . . . . . . . 1277
 G. AOL's Claim of Unjust Enrichment . . . . . . . . . . . . . . . . . . . . . . 1278
 H. NHCD's Liability for Acts of Its Contract E–Mailers . . . . . . . . . 1279

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1280

## I. INTRODUCTION

This case is before the court on the motion of the plaintiff America Online, Inc. ("AOL") for partial summary judgment on the issue of liability (Doc. No. 27). This case was commenced on December 18, 1998, when AOL filed a seven-count Complaint (Doc. No. 1) against the defendant National Health Care Discount, Incorporated ("NHCD"). In its Complaint, AOL alleges the following causes of action:

Count I: Violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 et seq. ("CFAA");

Count II: Dilution of interest in service marks, in violation of 15 U.S.C. § 1125(c)(1);

Count III: Violations of the Virginia and Iowa Computer Crimes Acts, Virginia Code Annotated § 18.2–152.1 et seq., and Iowa Code, Chapter 716A;

Count IV: Violation of Washington's Commercial Electronic Mail Act, Washington Revised Code Annotated, title 19, chapter 19.190, and the Washington Consumer Protection Act, Washington Revised Code Annotated, title 19, chapter 19.86;

Count V: Conversion of or trespass to chattels under the common law;

Count VI: Civil conspiracy; and

Count VII: Unjust enrichment.

AOL prays for compensatory and statutory damages, punitive damages, preliminary and permanent injunctive relief, attorney fees, and costs.

On March 24, 1999, NHCD answered the Complaint, generally denying liability on all counts, and asserting nine affirmative defenses. (Doc. No. 13) Two of these affirmative defenses are significant for purposes of AOL's motion: (1) as its second affirmative defense, NHCD asserts, "Any loss, injury, or damage incurred by AOL was proximately caused by the acts of third parties who[m] NHCD neither controlled nor had the right to control, and was not proximately caused by any acts, omissions, or other conduct of NHCD"; and (2) as its ninth affirmative defense, NHCD asserts that "should AOL prove any of the allegations in the Complaint, the mailing of any bulk electronic mail advertisement was performed by an independent contractor(s) whose actions NHCD is not liable for." (Doc. No. 13, ¶¶ 9 and 16)

Along with its Answer, NHCD filed a counterclaim, alleging three counts: (1) libel per se; (2) interference with prospective contractual relations; and (3) interference with contractual relations. (Doc. No. 13, ¶¶ 17–45) On March 22, 1999, AOL filed its Answer to the allegations in the counterclaim, generally denying liability and asserting numerous affirmative defenses. (Doc. No. 15)

On April 16, 1999, the parties consented to jurisdiction over this case by a United States Magistrate Judge (Doc. No. 17), and on April 19, 1999, the Honorable Donald E. O'Brien signed an order transferring the case to Magistrate Judge Paul A. Zoss (Docket No. 19).

On January 10, 1999, AOL filed its summary judgment motion (Doc. No. 27), supported by a memorandum brief (Doc. No. 38). AOL's motion seeks a determination that NHCD is liable on the following counts: Count I (the CFAA claim) (Doc. No. 38, at 12–14); Count III (only as to the Virginia Computer Crimes Act) (Doc. No. 38, at 14–16); Count V (only as to trespass to chattels) (Doc. No. 38, at 6–12); Count VI (civil conspiracy) (Doc. No. 38, at 20); and Count VII (unjust enrichment) (Doc. No. 38, at 16–20).[1] On March 31,

---

1. AOL also includes in its brief (Doc. No. 38) a section entitled "Defendant has Committed Fraud" (Section VIII), in which AOL argues NHCD committed common-law fraud, entitling AOL to summary judgment "on Count VII of AOL's Complaint." As noted above in the enumeration of AOL's claims, Count VII of the Complaint states a claim for unjust

1999, NHCD filed a resistance to the motion. (Doc. No. 58) On April 13, 2000, NHCD filed a cross-motion for summary judgment, asking that the Complaint be dismissed with prejudice. (Doc. No 69) AOL resisted NHCD's motion on April 17, 2000. (Doc. No. 72)

After the parties filed numerous briefs and other supporting documents concerning the motions and the resistances, the court heard oral arguments on April 17, 2000. At the conclusion of the hearing, the court denied NHCD's cross-motion for summary judgment (*see* Doc. No. 74, issued Apr. 18, 2000). The court also found the actions of Forrest Dayton (discussed *infra*, Section II) constituted trespass to chattels. Indeed, NHCD conceded for purposes of AOL's motion for summary judgment that AOL has established a *prima facie* case of trespass to chattels by Dayton. The question still remains, however, as to whether NHCD is liable for Dayton's actions. The court now will address that issue and the other issues raised by AOL's motion for partial summary judgment.

## II. STATEMENT OF FACTS

AOL is a Delaware corporation, with its principal place of business in Virginia. AOL provides a variety of services to its customers, or "members," as they are called by AOL. These services include the transmission of electronic mail ("e-mail") to and from other members and across the Internet.

NHCD is an Iowa corporation with administrative offices in Sioux City, Iowa, and sales offices in Atlanta, Kansas City, Phoenix, Dallas, and Denver. NHCD is engaged in the business of selling discount optical and dental service plans. NHCD membership entitles members to discounts from participating dentists and optical care providers.

This lawsuit concerns advertising via the Internet. There are various methods of advertising products on the Internet,[2] but this dispute concerns the sending of large-volume, unsolicited, commercial e-mail messages to Internet users. These messages, called "unsolicited bulk e-mail" or "UBE," are often referred to pejoratively as "junk e-mail" or "spam." It is undisputed that at times relevant to this lawsuit, a large volume of e-mail messages was sent through AOL's computer system to generate leads for NHCD's products.

AOL has put in place various "filtering programs" in an attempt to block UBE. By using these programs, AOL attempts to identify UBE coming into AOL's computer systems so that it can be rejected. These filtering programs have had only limited success, however, because bulk e-mailers have developed counter-programs to thwart the filtering programs.

In a declaration filed in support of AOL's motion (Doc. No. 30), AOL's Chief Mail Systems Architect, Jay Levitt, explained how AOL's efforts to limit UBE have been thwarted. AOL's filtering programs look for large numbers of e-mails coming from the same source. This usually can be determined from the message because the sender of an e-mail message ordinarily is identified in a "header" which is generated automatically by most e-mail software programs. To circumvent these filters, bulk e-mailers have developed software to allow the manipulation of headers to display false or misleading information

---

enrichment and imposition of a constructive trust. AOL's Complaint does not include a claim for fraud. Accordingly, to the extent it is based on a fraud claim, AOL's motion for summary judgment is **denied**, and the court will not address the fraud arguments contained in AOL's brief.

**2.** Another method of advertisement involves the placement of "banner" advertisements on Internet sites, usually for a fee. A banner advertisement consists of a short phrase appearing on an Internet user's computer screen that encourages the reader to "click" on the banner, which either results in the reader being provided with more information about the product or takes the reader to another Internet site sponsored by the advertiser. AOL sells banner advertisements to advertisers.

concerning a message's author. For example, one program substitutes a random arrangement of numbers and letters for the sender's name each time a message is transmitted. As a result, each message appears to originate from a different sender when, in fact, the messages are all coming from the same source. Other programs cause text to appear at the end of the body of the e-mail message that is designed to look like a header, but which contains false information having no relationship to the actual source or transmission path of the message. These messages contain a number of "hard returns" at the end of the message to push the automatically-generated header down the screen where the reader is unlikely to see it. Sometimes these messages also contain "font color codes" that change the text of the automatically-generated header to the same color as the background so the header becomes unreadable. (*See id.*, ¶ 6)

AOL has adopted policies applicable to its members in an effort to prevent them from sending UBE over AOL's computer system or from facilitating the sending of UBE over AOL's computer system by others. As bulk e-mail has become increasingly problematic, AOL's policies have been revised and strengthened to make it clear that members are not authorized to use AOL for bulk e-mail purposes.

The "Conditions of AOL Membership," displayed on every new member's computer screen at the time of enrollment, include the following:

> Your use of the America Online (AOL) service is conditioned upon your acceptance of AOL's Terms of Service (TOS) and Rules of the Road (ROR). We strongly encourage you to review the TOS and the ROR now by clicking the Read Now button below. (Both documents are always available online, free of hourly usage charges, and can be accessed directly on AOL directly by using Keyword: TOS.)

> As AOL may modify its TOS and ROR from time to time, you agree to check the TOS online area regularly for up-

dates. All TOS and ROR modifications will be effective thirty days after the notice of change is posted in the TOS online area.

(Doc. No. 32, Declaration of Charles D. Curran, AOL's Senior Counsel, in support of AOL's summary judgment motion, at Exhibit 4.)

AOL's Rules of the Road ("ROR") effective on June 15, 1996, provided members were not allowed to "post or use AOL to . . . post or transmit unsolicited advertising, promotional materials, or other forms of solicitation to other Members, individuals or entities, except in those areas (*e.g.*, the classified areas) that are designated for such a purpose," nor could members use AOL to collect or "harvest" screen names of other Members without the Member's express permission. (Doc. No. 32, ¶ 6 & Ex. 6, ¶ 2(C)(a)(8) & (a)(viii))

AOL's Terms of Service ("TOS") effective May 1, 1997, provided members could not "use, or allow others to use, [an] AOL account, either directly or indirectly, to . . . post or transmit, or cause to be posted or transmitted, any unsolicited advertising, promotional materials, or other forms of solicitation to other Members, individuals or entities, except in those areas that are expressly designated for such a purpose (*e.g.*, the classified areas), or collect or harvest screen names of other Members, without permission[,]" and stated AOL "reserve[d] the right to protect its Members and AOL from offensive e-mail communication, including, but not limited to, the right to block mass e-mail solicitations or 'junk e-mail.'" (Doc. No. 32, Ex. 7, TOS, ¶ 4(C)(7)) The ROR for the same date provided as follows:

> *Advertising, Solicitation and Name Harvesting.* Unless you obtain express permission from the Member in advance, you may not use AOL to send unsolicited advertising, promotional material or other forms of solicitation to another Member except in areas designated for such a purpose (e.g., the classified area). You may not use AOL to collect or "harvest" screen names of

Members without the express prior permission of the Member. AOL, Inc. reserves the right to block or filter mass e-mail solicitations on or through AOL. (Doc. No. 32, ¶ 8 & Ex. 7, ROR, ¶ C(iii)(g))

In the fall of 1997, AOL published an "Unsolicited Bulk E-mail Policy," which provided that AOL:

does not authorize the use of its proprietary computers and computer network (the ["]AOL Network") to accept, transmit or distribute unsolicited bulk e-mail sent from the Internet to AOL members. In addition, Internet e-mail sent, or caused to be sent, to or through the AOL Network that makes use of or contains invalid or forged headers, invalid or non-existent domain names or other means of deceptive addressing will be deemed to be counterfeit. Any attempt to send or cause such counterfeit e-mail to be sent to or through the AOL Network is unauthorized. Similarly, e-mail that is relayed from any third party's mail servers without the permission of that third party or which employs similar techniques to hide or obscure the source of the e-mail, is also an unauthorized use of the AOL Network. AOL does not authorize anyone to send e-mail or cause e-mail to be sent to the AOL Network that violates AOL's Terms of Service. AOL does not authorize the harvesting or collection of screen names from the AOL service for the purpose of sending unsolicited e-mail. AOL reserves the right to take all legal and technical steps available to prevent unsolicited bulk e-mail or other unauthorized e-mail from entering, utilizing or remaining within the AOL Network. Nothing in this policy is intended to grant any right to transmit or send e-mail to, or through, the AOL Network. AOL's failure to enforce this policy in every instance in which it might have application does not amount to a waiver of AOL's rights.

(Doc. No. 32, ¶ 9 & Ex. 9)

AOL's TOS effective July 15, 1998, provided:

**Unsolicited Bulk E-mail.** Your AOL membership allows you to send and receive e-mail to and from other AOL members and users of the Internet. This does not mean that you may use AOL to send unsolicited bulk e-mail or junk e-mail. Information about unsolicited bulk e-mail can be found at Keyword: *Junk Mail.* Your AOL membership and your authorization to use the AOL e-mail service do not allow you to send unsolicited bulk e-mail or to cause unsolicited bulk e-mail to be sent by someone else. **You may not use the Member Directory or any other area of AOL to harvest or collect information, including screen names, about AOL members, and the use of such information for the purpose of sending unsolicited bulk e-mail is strictly prohibited**.... AOL also reserves the right to take any and all legal and technical remedies to prevent unsolicited bulk e-mail from entering, utilizing or remaining within the AOL network.

(Doc. No. 32, ¶ 9 & Ex. 8; emphasis in original)

AOL's "Community Guidelines" (the successor to the "Rules of the Road") effective July 15, 1998, declare: "Unsolicited bulk e-mail is strictly prohibited." The Guidelines also provide, "You may not use the Member Directory or any other area of AOL to harvest or collect information, including screen names, about AOL members, and the use of such information for the purpose of sending unsolicited bulk e-mail is strictly prohibited. This includes the collection of names on a Member Web page." (*Id.*)

AOL maintains a searchable database on its computer system called "TOSSpam." AOL asks its members to forward UBE to TOSSpam so AOL can identify and attempt to stop the messages. According to Ivan Histand, a software engineer with AOL, during the period relevant to this litigation over 100,000 pieces of bulk e-mail were forwarded each day to TOSSpam by AOL members. (Doc. No. 34, Declaration

of Ivan Histand, ¶ 3) According to Histand, this represented merely a fraction of the total number of unsolicited e-mails sent to AOL members because in order to complain about a particular piece of UBE, a member must be aware of the TOSSpam database, know how to forward messages to the database, and take some affirmative action to send the message to TOSSpam. (*Id.*, ¶ 6) He estimates the actual number of UBEs received by AOL members is hundreds of times higher than the number of complaints forwarded to TOSSpam. (*Id.*, ¶ 8) Utilizing studies from two other lawsuits, he estimates the appropriate ratio of complaints to actual UBEs sent is 1:500. (*Id.*, ¶ 9)

According to Histand, 152,805 complaints have been received by AOL members concerning NHCD's UBEs, a number he believes is "at least ninety-five percent accurate." (*Id.*, ¶ 11) Multiplying 152,805 by 500, Histand estimates NHCD has sent or caused to be sent 76,402,500 pieces of UBE over AOL's network. (*Id.*, ¶ 13)

According to the declaration (Doc. No. 33) of A. Douglas Steinberg, AOL's Senior Director of E–Mail Operations, AOL's central computer systems are all physically located in Virginia. (Doc. No. 33, ¶ 3) One of the services AOL provides its members is access to the Internet, including the ability to transmit and receive e-mail to and from other AOL members and also other Internet users. (*Id.*, ¶ 4) According to Steinberg, the "per recipient charge" for each e-mail is $.00078. This charge is born by AOL and is not passed on as a direct charge to its members. It reflects AOL's equipment costs only, and not its overhead. (*Id.*, ¶ 12) Steinberg estimates that between five and thirty percent of AOL's daily Internet e-mail volume is UBE. (*Id.*, ¶ 21)

NHCD was founded in 1989, by Kenneth Opstein, its chief executive officer and sole shareholder. The company entered into agreements with dentists and optical care providers to offer discounted services and products to the general public, and then solicited the general public to pay a fee to NHCD for the right to receive these services at the discounted prices. NHCD made arrangements with a number of self-employed sales representatives to market these services to the general public from "leads" provided by NHCD. NHCD used a variety of advertising methods to generate these leads, including direct mail, newspaper, radio, television, and door-to-door sales.

NHCD first became involved in generating leads with UBE when Hermann Wilms, a vice president and "participating manager" of NHCD, was contacted by one of its "lead generators," Michael Kiger, about providing NHCD with leads obtained from the Internet. Kiger advised Wilms that he was knowledgeable about e-mail and he could use Internet e-mail to generate leads for NHCD. Wilms found this idea exciting, and agreed, on behalf of NHCD, to pay Kiger $1.00 for each lead he generated from the Internet.

After some initial problems,[3] Kiger, and then several other "e-mailers," began providing NHCD with leads generated from UBE. All of these bulk e-mailers worked without a written agreement, and under arrangements NHCD contends made them "independent contractors." The primary "contract e-mailer" used by NHCD was Forrest Dayton from Marietta, Georgia.

Contract e-mailers were directed to use a "script" provided by NHCD, which stated the following:

> Hello, we work with a group of your local doctors and dentists and are offering a Dental—Optical Plan that runs approximately $2 a week for an individual and $3 a week for the entire family with no limit to the number of children. Would you like our office to furnish you with the details?

NHCD did not do business.

---

3. For example, many of the leads provided initially were from other countries, where

Our doctors are grouped by area code and zip code, therefore please list your name, address, area code and phone number.

Thank you.

Using this script, Dayton performed an initial "test" mailing in late August and early September 1997. The test consisted of one million pieces of UBE. (Doc. No. 35, Declaration of Forrest Dayton in Support of AOL's Motion for Summary Judgment, ¶ 5)

On August 29, 1997, Wilms sent Dayton an e-mail with the following instructions concerning the test:

If your results are not over 1 %, I would attribute it to the subject. The term "insurance" is a turn off and probably a number of people will delete the message and not read it. We discovered that early on. The very best results we get is when we put into the subject box only the words . . . Dental Plan.

We run approx 3,000 leads per week from our predictive-dialers and salaried personnel for these past 7 years and that script I sent you is word for word. The only change is in the SUBJECT BOX.

If the results are poor, you may want to re-run to get a true indicator.

As a postscript, Wilms stated, "The 'shelf life' on the leads is short, so if you could forward to my AOL account daily, I would appreciate it." On September 1, 1997, Wilms sent Dayton an e-mail that stated, "Dental Plan in subject box is good for ½ %. From our experience all you need are those 2 words . . . nothing else."

On September 14, 1997, Wilms sent Dayton an e-mail stating the following:

Based on what the promo has produced, you can see that 1 million hits per week will yield approx 1,000 leads. This is what I will offer:

I will pay you each week $1 per lead with phone number (at first we will have to cap it at 1,000 leads or $1,000 per week until the offices can absorb the leads) and the lead is not more than 1 week old.

If you are interested in pursuing this, please email me.

Wilms sent Dayton an e-mail dated September 16, 1997, asking for Dayton's home address so Wilms could "overnite [him] some payroll forms." Wilms said, "The payroll is cutoff Monday mornings and your check will be mailed from Sioux City, Ia. on Thursdays to your home. $1 for each lead I receive with phone number, not over a week old, capped at 1,000 leads for first few weeks 'till we grow into." In a deposition given in this case on June 16, 1999, Wilms described this paperwork as the "original independent contractor's form." (*See* Doc. No. 31, Ex. 4, Deposition of Hermann Wilms ("Wilms Depo."), at p. 135, lines 2–11)

On October 6, 1997, Wilms sent Dayton an e-mail which stated the following:

After talking with you last night, I think we can do some increasing, however, if you were to do too much at one time you run the risk of being shut down and then we also have too many leads to work at one time . . . so we have to find a balance.

\* \* \* \* \* \*

Later this week, I'll call. In the meanwhile, if you want to increase the dental leads to 1,500, that's fine.

In his deposition, Wilms explained his reference to "being shut down" as follows:

Well, he told me that—that or Kiger was shut down, and so I said to him—actually, what I was trying to do was to keep his production low. I didn't want high production. And the real reason for it is, let's say that he could produce X number. I would have to hire more salespeople, and I didn't want to.

(*Id.*, page 136, lines 11–17.) When asked again about "risk of shut down," Wilms answered, "Well, see, he always wants more money because he's going to be shut down all the time. He said I can't afford to do this for a dollar because I'm going to be shut down." (*Id.*, page 140, lines 19–22) Later, Wilms explained that if he hired

and trained people to follow up leads, "and the leads weren't there because [Dayton] shut down or went out of business or moved or whatever, it wasn't secure. That's why I refer to shutdown on there. I was just feeling the water." (*See id.,* page 141, lines 14–21)

On November 5, 1999, Wilms was deposed in *AOL v. Dayton, et al.,* No. 98–1815–A (E.D.Va.). When asked about the e-mail dated October 6, 1997, the following exchange occurred:

Q. In the first paragraph, you tell—or you write that if you were to do too much at one time, you run the risk of being shut down; is that right?

A. That's what he told me.

Q. That's what Mr. Dayton told you?

A. Yes.

Q. And what did you understand him to mean when he told you that?

A. He couldn't send out—his production was limited by—apparently by his equipment.

Q. Okay. He told you that he didn't have the capability to send out—

A. Yes.

Q. Okay. Can you explain to me what the term "shut down" in this means?

A. He said he'd lose his server capabilities.

Q. What did you understand that to mean?

A. I really didn't know.

Q. Okay. But Mr. Dayton told you that if he sent out too much at one time, he'd run the risk of being shut down?

A. Yes.

(Doc. No. 61, Ex. 5, page 58, line 9 through page 59, line 16)

Wilms then was asked about an e-mail he sent to Dayton on October 13, 1997,[4] and the following exchange occurred:

Q. When you said "two t–1s," what did you mean?

A. We have some telephone equipment, he asked me if I had t–1s, and I said, yes, we have t–1s and he said, can I use them, and I asked him, why, and he said he could use them for mailing.

Q. Okay. Did he tell you what he was currently using for mailing?

A. No.

Q. Okay. In the next sentence, when you ask, "Can you send out more with less risk of shutdown," what were you referring to?

A. Well, he always wanted more money and he said he was going to be shut down if he couldn't get more money, so that's why it keeps recurring all the time.

(*Id.,* page 60, lines 8–24)

In early 1998, Dayton hired other contract e-mailers to transmit commercial e-mail for him. In his deposition, he testified that in late 1998, he stopped transmitting or having subcontractors transmit e-mail on NHCD's behalf. (Doc. No. 61, Tab 3, page 570, line 22 through page 571, line 5)

On April 15, 1998, Wilms asked Dayton to provide 2,000 leads per week, but Dayton was unable to comply. (Doc. No. 13, Tab 4, page 166, line 23 through page 167, line 1) On May 12, 1998, Wilms sent Dayton an e-mail requesting that Dayton pro-

---

**4.** This e-mail contains, *inter alia,* the following:

> I am serious about getting more involved in these mailings, however, I have a problem getting them processed by noon on Mondays for the payroll. It would be an immense help if you could send them 2 me midweek & Sat. That way if there is a glitch, as today I can make the payroll.

> I have 2 t–1's which can be modified for internet ... if you were to use them for mailings for me would there be any advantage over what you are now doing. Can you send out more with less risk of shutdown? Pls let me know.

(Doc. 31, Tab 16)

vide 4,000 leads per week. (*Id.*, page 169, line 20 through page 170, line 2)

On May 28, 1998, the Attorney General of the State of Washington sent a letter to Hermann Wilms, stating, *inter alia,* the following:

We have received a complaint regarding your firm's use of unsolicited email in the State of Washington. It appears you have sent multiple solicitations to citizens of this state using forged or false headers and hidden transmission routings. Please note that on June 11, 1998, a new law will go into effect which restricts the use of misleading return addresses and subject lines.

(Doc. No. 31, Tab 32) After receiving this letter, Wilms advised his contract e-mailers to stop doing business in the State of Washington.

In an e-mail to Wilms dated June 9, 1998, Dayton stated, "I got 500,000 out this morning with all tests came through. Will do 500k tonight." Wilms responded with an e-mail stating, "I'll be happy with 2,000 to 3,000 for now!" In a postscript to that e-mail, Wilms stated, "These 'against email' fanatics think this stuff is free!!" In his deposition, Wilms could not initially explain his reference to the "against email fanatics." (*See* Wilms Depo, page 181, lines 8–11). He then stated, "I think there was a man that has cameras inside of his house, his apartment. Instead of a female, it's a male, and he received some E-mail and wrote all kinds of stuff on one of the news groups about us." (*Id.*, page 181, lines 15–20)

On July 1, 1998, Charles D. Curran, an attorney for AOL, wrote a letter to NHCD stating the following:

On behalf of America Online, Inc. ("AOL"), I am writing to demand that you, your companies, and any of your agents immediately cease and desist from your practice of transmitting, distributing and facilitating the distribution of unsolicited bulk e-mail ("UBE") to AOL and its members.... Your transmissions of UBE to AOL and its members have resulted in numerous complaints, and have been accompanied by a variety of fraudulent practices.... Please be advised that any future attempt by you, your companies or agents—or anyone working in concert with you or on your behalf—to access AOL's proprietary computers and computer networks, or to use AOL's domain name and service marks, will constitute a violation of federal and state law, including the Computer Fraud And Abuse Act (18 U.S.C. Section 1030); the Lanham Act; the Virginia Computer Crimes Act (Va.Code Ann. Sections 59.196 *et seq.*); and Virginia common law. Failure to comply with this demand and to confirm such compliance via return letter within ten days, will result in AOL pursuing all available technical and legal remedies.

(Doc. No. 32, Ex. 1) In his affidavit, Wilms said when he received this letter, he telephoned Dayton and was assured "there were no laws that were being broken as no laws in fact prohibited the sending of this type of solicitation." (Doc. No. 61, Tab 1, at ¶ 3)

On July 16, 1998, Anne M. Breitkreutz, an attorney for NHCD, wrote to Curran and stated NHCD was an Iowa corporation with numerous offices throughout the United States in the business of selling "discounted service memberships for such services as dental, chiropractic, optical, etc." (*Id.*, Ex. 3) She stated further:

NHCD buys leads from independent contractors who generate these leads from direct mail, newspapers, radio, TV, telemarketing and the Internet. They buy the leads in bulk at so much per lead. NHCD cannot impose any restrictions or give directions on how these independent contractors procure these leads. However, NHCD does not authorize nor approve of the use by its independent contractors of the 'AOL.com' domain name or AOL's service or trademarks. In fact, NHCD will forward your letter of July 1, 1998 on to its independent e-mailers, particularly in-

structing them not to use said domain name or service mark when obtaining leads for NHCD. I believe this should address your concerns expressed in the letter dated July 1, 1998.

(*Id.*)

On August 13, 1998, Curran wrote a second letter to NHCD, stating in part:

AOL does not authorize the use of the AOL Network to accept, transmit, relay, process or distribute UBE sent from the Internet to AOL members. In addition, AOL deems Internet e-mail sent, or caused to be sent, to or through the AOL Network that makes use of or contains invalid or forged headers, invalid or non-existent domain names or other means of deceptive addressing to be counterfeit. Any attempt to send or cause such counterfeit e-mail through the AOL Network is unauthorized. Similarly, e-mail that is relayed from any third party's mail servers without permission of that third party, or which employs similar techniques to hide or obscure the source of e-mail, is also an unauthorized use of the AOL Network.

(*Id.*, Ex. 2) In his letter, Curran also requested that NHCD identify the parties responsible for the UBE, and provide NHCD's policies concerning "spam." In his affidavit, Wilms said when he received the August 13, 1998, letter from AOL, he again called Forrest Dayton, and Dayton again assured him that no laws were being broken. (*Id.*, ¶ 5)

This lawsuit was commenced on December 18, 1998. In a deposition given on November 2, 1999, in a separate lawsuit,[5] Forrest Dayton testified Wilms told him NHCD was being sued by AOL, but did not tell him why. (Doc. No. 61, Tab 3, page 571, lines 6–22) Dayton denied he had been advised by Wilms of any of AOL's warning letters. (*Id.*, page 572, line 5 through page 573, line 10)

Dayton testified he began sending bulk e-mail in 1996. In 1997, he started using e-mail address lists he created by stripping e-mail addresses from newsgroups. Later, he began stripping e-mail addresses from AOL "chat rooms." He estimated that he has harvested 5,000,000 AOL e-mail addresses. He used a number of different e-mail accounts to send commercial e-mails because recipients would complain to AOL about the receipt of bulk e-mail, and then his account would be terminated. While he was in the bulk e-mail business, between fifteen and thirty of his e-mail accounts were terminated because of complaints to Internet service providers.

On March 18, 1999, Wilms sent Dayton an e-mail in which he stated the following: "In today's USA Today the big antispam device is *Sendmail*, is that a big deal?" During his deposition, Wilms was asked why he sent this e-mail to Dayton. He responded, "Because he must have been complaining about I'm not going to be in business much longer, something like that." (Doc. No. 31, Tab 4, page 165, lines 5–8) Wilms then stated he was unfamiliar with anti-spam devices. (*Id.*, page 165, lines 22–24).

In a declaration dated January 6, 2000, Dayton confirmed that from January 1997, until early 1999, he was engaged in the business of marketing goods and services by sending UBE and by developing software (including a program called "Stealth Mass Mailer") to harvest e-mail addresses and automatically send massive quantities of e-mail quickly. (Doc. No. 35, ¶ 1) The software could fill in the "To" and "From" fields with random or otherwise inaccurate information. (*Id.*) Dayton described this process as follows:

At various times during my e-mailing for NHCD, AOL used filtering devices to attempt to stop UBE. To get around

---

**5.** *AOL v. Forrest Dayton, et al.,* No. CA98–1815–A (E.D.Va.). In the lawsuit, a judgment was entered in which Dayton was enjoined from transmitting unsolicited bulk e-mail communication over AOL's computer networks, from harvesting AOL member e-mail addresses, and from engaging in any activity that would constitute the unauthorized use of AOL computers. He stipulated that he was responsible for the acts of his "independent contractors," and he was liable to AOL for $1,200,000.00.

these filters, I input, either manually or with the assistance of software, nonexistent or otherwise inaccurate "From" information, as well as other inaccurate information. Most often, the "From" information consisted of an actual domain name (but not the name of my own internet service provider), such as "juno.com", and made up prefixes, often random letters and numbers, so the result would look something like "1a2b3c@juno.com."

(*Id.*, ¶ 12)

According to Dayton, over the time period relevant to this lawsuit, a fair estimation of the ratio of pieces of e-mail sent to actual leads generated for NHCD was approximately 1000:1.[6] (*Id.*, ¶ 8) Dayton said he could not determine the exact number of e-mails he sent on behalf of NHCD, but estimated the number to be in the hundreds of millions. (*Id.*, ¶ 9) Dayton said he provided NHCD with more than 130,000 leads from late summer 1997, to early 1999. (*Id.*, ¶ 7)

NHCD confirmed that, from all of its contract e-mailers, it received 33,866 bulk e-mail leads in 1997; 323,686 in 1998; and 35,708 from January 1 to February 11, 1999. (Doc. No. 31, Tab 2, response to Interrog. No. 11) This is a total of 393,260 leads, for which NHCD paid a total of $612,577.75. Dayton estimated "as much as 75% of the UBE sent was to AOL e-mail addresses." (Doc. No. 35, ¶ 11) Using Dayton's ratio of 1000:1, in order to produce 393,260 leads, the contract e-mailers had to send out nearly 400 million UBEs, about 300 million of which (*i.e.*, 75%) were sent to AOL members.[7]

There is no evidence that Wilms ever instructed Dayton, or any of NHCD's other contract e-mailers, on the exact method of transmitting UBE. However, according to Dayton, "Wilms never told me not to generate leads by e-mail, or that NHCD

would not condone me harvesting e-mail addresses or using inaccurate 'To' and 'From' information to facilitate their mailings. In fact, even after Wilms told me AOL had sued NHCD, I continued to send UBE for NHCD and get paid by NHCD for leads generated by UBE." (Doc. No. 35, ¶ 13)

In an affidavit filed in resistance to the motion for summary judgment, Wilms acknowledged he had engaged Dayton "to transmit unsolicited commercial e-mail on behalf of NHCD." (Doc. No. 61, Tab 1, ¶ 2) NHCD maintains, however, that it had no knowledge of any improper activities by these contract e-mailers. In his affidavit, Kenneth Opstein states:

> With regard to solicitation of leads on the internet, NHCD has employed various independent contractors from time to time to generate leads via the internet. These independent contractors have never been employees or agents of NHCD in any way. NHCD has never told these independent contractors how to solicit the leads. Specifically with regard to Forrest Dayton, neither [Opstein] nor any company representatives had any knowledge of the methods employed by Mr. Dayton to generate leads for [NHCD]. [NHCD] simply paid Mr. Dayton $1.00 to $2.00 for every lead generated by him. All payments made to Dayton by NHCD were done by NHCD's Sioux City office in the form of checks.

(Doc. No. 61, Tab 2, ¶ 5)

Opstein further states, "NHCD paid bulk e-mailers for all leads generated by them, regardless of the number of e-mails sent. [NHCD] had no knowledge of the arrangements made between [NHCD's] e-mailers and internet service providers, such as AOL, for the e-mailers to transmit bulk e-mail on the ISP's systems." (*Id.*,

---

**6.** This low response ratio reflects the fact that most recipients of UBE do not respond.

**7.** This estimate is much larger than Histand's estimate of 76,402,500 UBEs sent over AOL's

system, which was an extrapolation from the number of complaints received. *See* page 1261, *supra.*

¶ 6) According to Opstein, "NHCD never authorized e-mailers to employ false or misleading entries in the 'To' or 'From' lines in bulk e-mail." *(Id.,* ¶ 7) These statements are confirmed, to some extent, by Dayton's statement that companies like NHCD, which paid him a certain amount for each lead, would simply order a certain number of leads, and he would do what was necessary to generate the leads. He did not provide his customers with an estimate of how many e-mail messages he would have to transmit to generate the number of leads ordered. *(See* Doc. No. 61, Tab 3, page 232, line 8 through page 234, line 15)

### III. LEGAL ANALYSIS

The court first will address the choice of law questions applicable to this case. Next, the court will discuss the general standards applicable to summary judgment motions. The court then will analyze each of the six grounds asserted by AOL in support of its motion for partial summary judgment.[8] Finally, the court will determine whether AOL has shown, for summary judgment purposes, that NHCD should be held responsible for the acts of its contract e-mailers.[9]

#### A. Choice of Law

The court first must determine what law should be applied to the non-statutory claims in this case; *i.e.,* the claims for conversion of or trespass to chattels (Count V); civil conspiracy to commit trespass to or conversion of chattels, and to violate the CFAA and certain Washington, Iowa and Virginia statutes (enumerated at page 2, *supra* ) (Count VI); and unjust enrichment and imposition of a constructive trust (Count VII). AOL argues Virginia law applies "because Virginia is the location of AOL's computers which have been assaulted by NHCD's UBE." (Doc.

No. 38, p. 3) NHCD disagrees with AOL's focus on the situs of the alleged injury. NHCD argues Iowa law applies under Iowa's "most significant relationship" test. (Doc. No. 59, pp. 2–3)

A federal court exercising supplemental jurisdiction over state law claims in a federal question lawsuit must follow the choice-of-law rules of the forum state. *MRO Comm., Inc. v. American Tel. & Tel. Co.,* 197 F.3d 1276, 1282 (9th Cir.1999); *BancOklahoma Mortgage Corp. v. Capital Title Co.,* 194 F.3d 1089, 1103 (10th Cir. 1999); *Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co.,* 129 F.3d 143, 148 (D.C.Cir.1997); *Glennon v. Dean Witter Reynolds, Inc.,* 83 F.3d 132, 136 (6th Cir.1996); *Paracor Fin., Inc. v. General Elec. Capital Corp.,* 96 F.3d 1151, 1164 (9th Cir.1996); *System Operations, Inc. v. Scientific Games Devel. Corp.,* 555 F.2d 1131, 1136–37 (3d Cir.1977) (citing *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19 (3d Cir.1975); and *UMW v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)); *F.D.I.C. v. Deloitte & Touche,* 834 F.Supp. 1129, 1135 n. 3 (D.Ark.1992) (citing *Klaxon* ). *See also Butler v. Local Union 823, Int'l Bhd. of Teamsters, Chauffeurs, Whsmen. & Helpers,* 514 F.2d 442, 448 n. 6 (8th Cir.1975) ("[T]he question of which law governs as between two states is purely a state question[,]" citing *Klaxon* ). Accordingly, the court looks to Iowa's choice-of-law rules to determine which state's law applies.

As both AOL and NHCD agree,[10] Iowa follows the "most significant relationship" test expressed in section 145, Restatement (Second) Conflict of Laws ("Restatement"). *See, e.g., Christie v. Rolscreen Co.,* 448 N.W.2d 447, 450 (Iowa 1989); *Zeman v. Canton State Bank,* 211 N.W.2d 346, 348–

---

8. For purposes of this analysis only, the court will assume NHCD is responsible for the conduct of its contract e-mailers.

9. On this record, there is no evidence NHCD sent out any bulk e-mail other than through contract e-mailers.

10. *See* AOL's brief, Doc. No. 38, at 3–4; NHCD's brief, Doc. No. 59, at 2–5.

49 (Iowa 1973); *Berghammer v. Smith,* 185 N.W.2d 226, (Iowa 1971). *See also Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.,* 23 F.Supp.2d 974, 1002 (N.D.Iowa 1998) (recognizing the Iowa rule). The agreement ends there, however, as the parties differ on how the Restatement factors apply in the circumstances of this case.

The Restatement's "General Principle" set forth in section 145 provides:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) Conflict of Laws § 145 (1971).[11]

Section 145 must be read together with section 6, to which it refers:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflict of Laws § 6 (1971).

■ The parties only address the section 145 factors in their arguments concerning which state law applies here. As NHCD points out in its brief, none of those factors points conclusively to Virginia—nor, however, do those factors point clearly to Iowa or to any other state. The section 145 factors provide little in the way of resolving the choice-of-law issue. The court therefore turns to the principles set forth in section 6.

The principles in section 6(2) "underlie all rules of choice of law and are used in evaluating the significance of a relationship, with respect to the particular issue, to the potentially interested states, the occurrence and the parties." Restatement § 145, comment (b). Subsections 6(2)(d), (e) and (f) are less important in the field of torts than they are in other areas such as contracts, property, wills and trusts. *Id.* "Because of the relative insignificance of the above-mentioned factors in the tort area of choice of law, the remaining factors listed in § 6 assume greater importance . . . ," particularly the relevant policies of "the state with the dominant interest in

---

**11.** Note subsection (1) states this section applies to "an issue in tort"; thus, the section 145 analysis will apply only to AOL's claims in Count V (trespass to chattels) and that portion of Count VI (civil conspiracy) relating to trespass to chattels. Counts I and III are statutory causes of action governed by the statutes themselves. Count VII, unjust enrichment, is a quasi-contractual claim that requires analysis under section 6 of the Restatement, discussed *infra* in this Section.

the determination of the particular issue[.]" *Id.* The court finds the factors in subsections (2)(b) and (c) to be controlling; *i.e.*, the relevant policies and interests of Iowa and Virginia.

As noted previously, NHCD is an Iowa corporation, doing business in Iowa. "[A] state has an obvious interest in regulating the conduct of persons within its territory...." Restatement § 6, comment d. Iowa's interest in regulating the actions of corporations doing business in Iowa is embodied in the Iowa Business Corporation Act, Iowa Code chapter 490. A corporation has no rights, including the right to do business, other than the rights conferred by the state's lawmaking power, and the state retains the right to amend the conditions under which corporations may do or continue to do business, and enforce those conditions by revoking a corporation's privileges for noncompliance. *See* Iowa Code Ann. § 290.102; *St. John v. Iowa Bus. Men's Bldg. & Loan Ass'n,* 136 Iowa 448, 113 N.W. 863 (1907). The state, therefore, has a vested interest in determining the rights and liabilities of domestic corporations as to actions arising within the state.

Here, however, the only actions by NHCD that appear to have arisen within Iowa are incorporation of the entity, maintenance of an office, and issuance of checks to pay the contract e-mailers. One could add to this list the receipt of NHCD's UBE by Iowa residents. Otherwise, all the actions giving rise to this lawsuit appear to have occurred elsewhere, in a number of states. AOL is incorporated in Delaware, and likely has members who received NHCD's UBE in all fifty states. Dayton's actions originated in Georgia. The record indicates NHCD contracted with other e-mailers from, *inter alia,* New York, California, Ohio, Florida, Missouri, Michigan, Tennessee, Kansas, Ohio and Maryland.[12] (*See* Doc. No. 31, tab 2, NHCD's supplemental discovery responses) NHCD's vice president Hermann Wilms, who, among other things, was responsible for contracting with Dayton, operated out of Overland Park, Kansas. (*See, e.g.,* Doc. No. 31, tab 4, page 3, lines 4–8; tab 32, letter to Wilms from Washington Attorney General).

In addition to "regulating the conduct of persons within its territory," a state also has "an obvious interest ... in providing redress for injuries that occurred there." Restatement § 6, comment e. In the instant case, because there is no clearly demonstrable place where the alleged conduct occurred, "the place where the injury occurred is a contact that, as to most issues, plays an important role in the selection of the state of the applicable law." *Id.* (citation omitted).

The only locale in which AOL's alleged injury is clearly demonstrable is Virginia. This is the site of AOL's hardware that it alleges was overburdened by NHCD's UBE. It also is the place where AOL allegedly sustained economic loss. Although no state has a clear relationship to the events giving rise to this action, Virginia's relationship appears to be the most significant. Accordingly, the court finds Virginia law shall control the non-statutory claims raised in this lawsuit.

### B. Standards for Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment and provides that either party to a lawsuit may move for summary judgment without the need for supporting affidavits. Fed.R.Civ.P. 56(a) & (b). Rule 56 further states that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

---

12. However, there is nothing in this record to indicate which, if any, of the contract e-mailers besides Dayton actually utilized AOL to send UBE for the purpose of soliciting leads on NHCD's behalf.

Fed.R.Civ.P. 56(c). "A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, ... and give [the nonmoving party] the benefit of all reasonable inferences that can be drawn from the facts." *Lockhart v. Cedar Rapids Comm. Sch. Dist.*, 963 F.Supp. 805, 814 (N.D.Iowa 1997) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The party seeking summary judgment must " 'inform[ ] the district court of the basis for [the] motion and identify[ ] those portions of the record which show lack of a genuine issue.' " *Lockhart*, 963 F.Supp. at 814 (quoting *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is one with a real basis in the record. *Lockhart*, 963 F.Supp. at 814 n. 3 (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56). Once the moving party has met its initial burden under Rule 56 of showing there is no genuine issue of material fact, the nonmoving party, "by affidavits or as otherwise provided in [Rule 56],[13] must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e); *Lockhart*, 963 F.Supp. at 814 (citing *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356).

Addressing the quantum of proof necessary to successfully oppose a motion for summary judgment, the United States Supreme Court has explained the nonmoving party must produce sufficient evidence to permit " 'a reasonable jury [to] return a verdict for the nonmoving party.' " *Lockhart*, 963 F.Supp. at 815 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Furthermore, the Court has held the trial court must dispose of claims unsupported by fact and determine whether a genuine issue exists for trial, rather than "weigh the evidence and determine the truth of the matter." *Lockhart*, 963 F.Supp. at 815 (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11; *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53; *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56).

The Eighth Circuit recognizes "summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990) (*citing* Fed.R.Civ.P. 56(c)). The Eighth Circuit, however, also follows the principle that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* (quoting *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548); *Hartnagel v. Norman*, 953 F.2d 394, 396 (8th Cir.1992).

Thus, the trial court must assess whether a nonmovant's response would be sufficient to carry the burden of proof at trial. *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548). If the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable jury could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247.

The court now will apply these standards to AOL's motion for summary judgment.

### C. AOL's Claim Under the CFAA

AOL argues the evidence in this case is sufficient to establish NHCD's liability to

---

**13.** *I.e.*, by "affidavits ... supplemented or opposed by depositions, answers to interrogatories, or further affidavits." Fed.R.Civ.P. 56(e).

AOL under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*[14] Specifically, AOL argues NHCD violated 18 U.S.C. §§ 1030(a)(5) and (a)(2)(C). The former subsection prohibits a person or entity from:

(A) knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer;

(B) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage; or

(C) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage[.]

18 U.S.C. § 1030(a)(5).[15] Section (a)(2)(C) prohibits a person or entity from:

(2) intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing]—

\* \* \* \* \* \*

(C) information from any protected computer if the conduct involved an interstate or foreign communication[.]

18 U.S.C. § 1030(a)(2)(C).

Civil penalties are provided by subsection 1030(g), which provides, "Any person who suffers damage or loss by reason of a violation [of section 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). The term "damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system or information that . . . causes loss aggregating at least $5,000 in value during any 1–year period to one or more individuals; . . . ." 18 U.S.C. § 1030(e)(8)(A).

The elements of a civil claim under section 1030(a)(5)(C) are as follows: (1) the person or entity must intentionally access a computer; (2) the computer must be a "protected computer;" (3) the access must be without authorization; and (4) the access must cause damage. There is no question that AOL's computers are "protected computers."[16] However, it remains for the court to determine whether NHCD's contract e-mailers intentionally accessed AOL's computers, whether any such access was "without authorization," and whether such access caused damage to AOL.

■ The CFAA does not define "access," but the general definition of the word, as a transitive verb, is to "gain access to." MERRIAM–WEBSTER'S

---

**14.** As stated in footnote 7, *supra,* for purposes of this analysis, the court will assume NHCD is responsible for the conduct of its contract e-mailers.

**15.** The court will limit its consideration of AOL's claim to subsection (a)(5)(C), because AOL has advanced no argument in support of its claims under subparagraphs (A) and (B). As discussed *infra* in this opinion, the CFAA initially contained only criminal penalties. Subparagraph (A), which applies to an "insider" who intentionally causes damages to a protected computer, and subparagraph (B), which applies to an "outsider" who accesses a protected computer and recklessly causes damage, both carry five-year prison sentences for a first offense. Subparagraph (C), which applies to an "outsider" who accesses a protected computer and causes damage (appar-

ently without regard to intent; *i.e.,* intentionally, recklessly, or inadvertently), carries a one-year sentence for a first offense. 18 U.S.C. § 1030(c)(2)(A) and (B). Civil remedies were added to the statute by the 1994 amendments. For purposes of a civil claim against an "outsider," there is no reason for AOL to assume the higher burden required by subparagraph (B), instead of the lower burden required by subparagraph (C). However, to the extent NHCD's e-mailers may have been "insiders," as "members" of AOL, AOL has not sought summary judgment under subsection (A).

**16.** A "protected computer" is defined in 18 U.S.C. § 1030(e)(2)(B) as any computer "which is used in interstate or foreign commerce or communication."

COLLEGIATE DICTIONARY (hereinafter "Webster's") 6 (10th ed.1994). As a noun, "access," in this context, means to exercise the "freedom or ability to . . . make use of" something. *Id.* The question here, therefore, is whether NHCD's e-mailers, by harvesting e-mail addresses of AOL members and then sending the members UBE messages, exercised the freedom or ability to make use of AOL's computers. The court finds they did. For purposes of the CFAA, when someone sends an e-mail message from his or her own computer, and the message then is transmitted through a number of other computers until it reaches its destination, the sender is making use of all of those computers, and is therefore "accessing" them. This is precisely what NHCD's e-mailers did with respect to AOL's computers.

■ The next disputed element of AOL's claim under section 1030(a)(5)(C) is whether the access was "without authorization." Again, the CFAA again gives no direct guidance on the meaning of the phrase "without authorization."[17] In a case similar factually to the present one, the United States District Court for the Eastern District of Virginia found an e-mailer's actions constituted "unauthorized access" because they violated AOL's Terms of Service. *See America Online, Inc. v. LCGM, Inc.,* 46 F.Supp.2d 444, 450–51 (E.D.Va.1998); *see also Hotmail Corp. v. Van$ Money Pie, Inc.,* 1998 WL 388389 (N.D.Cal. Apr.16, 1998). No other reported opinion contains precisely this interpretation of the statute.

Although AOL clearly advised its members they were not authorized to harvest member e-mail addresses from its system or to use its system to send UBE to its members (*see* Terms of Service, Rules of the Road, and Community Guidelines, summarized above at pages 6–9), it is not clear that a violation of AOL's membership agreements results in "unauthorized access." If AOL members are "insiders" rather than "outsiders" for purposes of section 1030(a)(5), then subparagraph (C) does not apply at all, and this inquiry ends for purposes of AOL's motion. (*See,* footnote 15, *supra.*) AOL members, such as Dayton, obviously have "authorization" to access the AOL network. Having done so, is a member's authorized access converted into unauthorized access when the member violates one of the terms and conditions of membership? Similarly, is the member converted from an "insider" to an "outsider" for purposes of the CFAA by violating AOL's policies? On the other hand, if AOL members are "outsiders," then why would AOL's membership policies apply to them at all? Furthermore, by imposing restrictions on its members, can AOL deny or restrict the rights of non-member Internet users with respect to sending any type or volume of e-mail to AOL members, including UBE? These unanswered questions represent mixed issues of fact and law, requiring further factual development before the court can rule. This record is not clear enough on these issues for the court to grant summary judgment.

Even assuming *arguendo* that NHCD's e-mailers accessed AOL's system "without authorization," the question still remains whether such access caused AOL "damage" for purposes of the CFAA. "Damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system or information that. . . . causes loss aggregating at least

---

**17.** The statute does define the phrase "exceeds authorized access" as "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6).

In a case with analogous facts to the present one, the court found AOL member addresses obtained by a bulk e-mailer were proprietary "information" for purposes of the statute. *See AOL v. LCGM, Inc.,* 46 F.Supp.2d 444, 450–51 (E.D.Va.1998).

$5,000 in value during any 1–year period to one or more individuals; ...." 18 U.S.C. § 1030(e)(8)(A). There is no dispute AOL has suffered the $5,000 threshold amount of *loss* required for civil relief under the CFAA. Multiplying the most conservative estimate in this record of the number of NHCD UBEs sent over AOL's system (*i.e.*, 76,402,500) by the direct cost to AOL of each e-mail (*i.e.*, $.00078), AOL's damages would be $59,594. However, the court also must determine whether NHCD's UBEs impaired "the integrity or availability of data, a program, a system or information." Neither the CFAA nor any of the reported cases is instructive in this regard.

"The starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The court will begin by examining the "ordinary, contemporary, common meaning" of the terms contained in the statute, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. L.P.*, 507 U.S. 380, 388, 113 S.Ct. 1489, 1495, 123 L.Ed.2d 74 (1993), defining those terms with regard to the context in which they are used in the statute. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41, 117 S.Ct. 843, 846–47, 136 L.Ed.2d 808 (1997).

Section 1030(e)(8)(A) provides, in relevant part: "the term 'damage' means any *impairment* to the *integrity* or *availability* of *data*, a *program*, a *system*, or *information*, that .. causes loss aggregating at least $5,000 in value during any 1–year period to one or more individuals[.]" Each of the underlined terms is defined below:

| | |
|---|---|
| Impairment: | something that damages or makes worse by diminishing in some material respect. (*See* Webster's at 580) |
| Integrity: | Unimpaired, sound, complete, without corruption. (*See* Webster's at 608) |
| Availability: | The state of being present or ready for immediate use; accessible. (*See* Webster's at 79) |
| Data: | Information output that must be processed to be meaningful; information in numerical form that can be transmitted or processed digitally. (*See* Webster's at 293) |
| ·Program: | A sequence of coded instructions that can be inserted into a computer, causing it to perform a particular function. (*See* Webster's at 931) |
| System: | "[A] regularly interacting or interdependent group of items forming a unified whole ... [such as] a group of devices or artificial objects ... forming a network ...." (Webster's at 1197) |
| Information: | Knowledge obtained from investigation, study, or instruction; facts, data; "a signal or character (as in a communication system or computer) representing data." (Webster's at 599) |

From these definitions, it can be concluded that when a large volume of UBE causes slowdowns or diminishes the capacity of AOL to serve its customers, an "impairment" has occurred to the "availability" of AOL's "system." [18]

---

**18.** *See American Guarantee & Liability Ins. Co. v. Ingram Micro, Inc.*, 2000 WL 726789 (D.Ariz. Apr.19, 2000), where the court found the term "physical damage" was "not restricted to the physical destruction or harm of computer circuitry but includes loss of access, loss of use, and loss of functionality." *Id.* at

\*2. The court noted, in dicta, "Lawmakers around the country have determined that when a computer's data is unavailable, there is damage; when a computer's services are interrupted, there is damage; and when a computer's software or network is altered, there is damage." *Id.* at \*3.

AOL has submitted witnesses' written declarations establishing that UBE, generally, has created a substantial burden to AOL's computer system, and caused AOL to incur significant costs. AOL's problem, both for purposes of summary judgment and at trial, is showing specifically that NHCD's UBE, which by AOL's admission represents a mere fraction of the quantity of UBE regularly forced through AOL's system, caused the requisite "damage" contemplated by the statute. The fact that NHCD's UBE may have cost AOL over $50,000 does not, necessarily, mean NHCD's actions caused an "impairment to the integrity or availability of data, a program, a system, or information," which directly resulted in a $50,000 loss. The court finds a material issue of disputed fact exists in this regard, precluding summary judgment.

A disturbing issue is whether subsection (a)(5)(c) is intended to address UBE at all. The original statute, enacted in 1984, was directed at protecting classified information in government computer systems, and protecting financial records and credit histories in financial institution computers. *See* S.Rep. No. 99–432, at § I (1986 W.L. 31918), 1986 U.S.C.C.A.N. 2479 (discussing the 1986 amendments to the statute). When the statute was amended in 1986, the Senate Judiciary Committee expressly rejected the approach of enacting a comprehensive, sweeping statute that would leave "no computer crime ... potentially uncovered," opting instead "to limit Federal jurisdiction over computer crime to those cases in which there is a compelling Federal interest, *i.e.*, where computers of the Federal Government or certain financial institutions are involved, or where the crime itself is interstate in nature." *Id.*

The statute provided only criminal penalties until enactment of the Computer Abuse Amendments Act of 1994, which added the civil remedies subsection 1030(g). *See* S.Rep. No. 104–357, § IV(1)(E) (1996 W.L. 492169) ("1996 S. Rep."); H.R. Conf. Rep. No. 103–711, § 290001(d) (1994 W.L. 454841), 1994 U.S.C.C.A.N. 1839. At the same time,

subsection 1030(a)(5) was amended "to further protect computers and computer systems covered by the statute from damage both by outsiders, who gain access to a computer without authorization, and by insiders, who intentionally damage a computer." In discussing the amendments to subsection (a)(5), the Senate Judiciary Committee noted:

In sum, under the bill, insiders, who are authorized to access a computer, face criminal liability only if they intend to cause damage to the computer, not for recklessly or negligently causing damage. By contrast, outside hackers who break into a computer could be punished for any intentional, reckless, or other damage they cause by their trespass.

1996 S. Rep., § IV(1)(E). AOL does not claim NHCD's e-mailers were "outside hackers," or that NHCD "intend[ed] to cause damage to the computer." Rather, NHCD's e-mailers (or at least Dayton) were members of AOL, accessing AOL's system as a result of that membership. Realistically, no federal statute currently exists which would prohibit a non-AOL member from sending UBE to any number of AOL members' e-mail addresses, without ever accessing AOL directly.

AOL's claims against NHCD seem to fall more properly under subsection 1030(a)(2)(C), which proscribes intentionally accessing a computer either without authorization or in excess of authorized access, and thereby obtaining "information from any protected computer if the conduct involved an interstate of foreign communication[.]" 18 U.S.C. § 1030(a)(2)(C). Legislative history indicates the "premise of [subsection (a)(2)] is privacy protection[.]" *Id.* Prior to the amendment, the statute only protected "information on the computer systems of financial institutions and consumer reporting agencies, because of their significance to our country's economy and the privacy of our citizens." 1996 S. Rep. at § IV(1)(B). The amendment extended the statute's reach to include in-

formation held on private computers, under appropriate circumstances. *See id.*

The Committee noted intangible information, stored electronically, could be obtained for purposes of the statute not only by actual physical theft, but by "mere observation of the data," explaining the "crux of the offense under subsection 1030(a)(2)(C), however, is the abuse of a computer to obtain the information." *Id.* The statute's distinction for purposes of criminal penalties is instructive in discussing damages for civil purposes; *i.e.,* individuals who obtain information with a value of $5,000 or less are subject to misdemeanor penalties, while "[t]he crime becomes a felony if the offense was committed for purposes of commercial advantage or private financial gain[.]" *Id.* There is no question the information obtained from AOL was for purposes of NHCD's private financial gain. Thus, it appears the elements of a claim under subsection (a)(2)(C) have been met, to-wit: (1) NHCD's e-mailers "intentionally accesse[d] a computer"; (2) they "exceed[ed] authorized access" by violating the Terms of Service; (3) as a result, they obtained information; (4) the information was obtained from a "protected computer"; and (5) their conduct involved an interstate or foreign communication.

Nevertheless, even having reached this conclusion, we again arrive at the issue of damages. Even though NHCD's violation of subsection (a)(2)(C) appears to be much clearer than a violation of (a)(5)(C), AOL still must show NHCD's UBE caused the requisite damage for purposes of the statute. The court finds such a showing has not been made, and remains a disputed issue of material fact for trial. Therefore, AOL's motion for summary judgment on this claim is **denied.**

### D. AOL's Claim Under the Virginia Computer Crimes Act

In Count III of its Complaint, AOL claims NHCD violated the Virginia Computer Crimes Act, Virginia Code Annotated § 18.2–152.1 *et seq.* ("VCCA"), specifically section 18.2–152.3, which provides:

Any person who uses a computer or computer network without authority and with the intent to:

. . . .

(3) Convert the property of another shall be guilty of the crime of computer fraud. . . .

Va.Code Ann. § 18.2–152.3 (1999). The VCCA provides a civil remedy in section 18.2–152.12, for the recovery of damages. The section provides its remedies are in addition to other available civil remedies, and prescribes damages applicable to AOL's claim, as follows:

If the injury arises from the transmission of unsolicited bulk electronic mail, an injured electronic mail service provider may also [in addition to damages and costs of suit] recover attorneys' fees and costs, and may elect, in lieu of actual damages, to recover the greater of ten dollars for each and every unsolicited bulk electronic mail message transmitted in violation of this article, or $25,000 per day.

Va.Code Ann. § 18.2–152.12(C) (1999).

Application of the VCCA to the facts of this case is a simpler matter than application of the CFAA, largely because of the VCCA's specific definition of relevant terms. The Virginia statute seems to have been crafted for just the type of injury alleged by AOL in this case. The statute specifically defines "without authority" as follows:

A person is "without authority" when (i) he has no right or permission of the owner to use a computer *or he uses a computer in a manner exceeding such right or permission or (ii) he uses a computer, a computer network, or the computer services of an electronic mail service provider to transmit unsolicited bulk electronic mail in contravention of the authority granted by or in violation of the policies set by the electronic mail service provider.*

Va. Stat. Ann. § 18.2–152.2 (1999) (emphasis added).

The court finds Dayton and other e-mailers violated the Virginia statute; however, they are not parties to this lawsuit. Whether NHCD is liable for Dayton's actions still remains to be determined, as discussed below. If NHCD is liable for its e-mailers' actions, then AOL is entitled to summary judgment on this claim, with damages to be determined at trial.

### E. AOL's Claim for Trespass to Chattels

AOL has asserted a common-law claim for trespass to chattels (Count V). Because the court has found Virginia law applies to AOL's common-law claims, the court looks to the law of that state to see whether AOL has shown it is entitled to judgment as a matter of law on its common-law trespass to chattels claim.

Neither the statutes nor the case law of Virginia appear to define precisely the tort of trespass to chattels with respect to personal property. Therefore, the court will look to other law that may be applied by analogy. The Virginia Supreme Court has noted that when someone illegally seizes another's personal property and converts it to his own use, the property's owner may bring an action for trespass (among other claims). *See Vines v. Branch,* 244 Va. 185, 190, 418 S.E.2d 890, 893–94 (1992). With respect to real property, the Virginia Code makes it a crime for a person to enter land or buildings for the purpose of "interfer[ing] with the rights of the owner, user or the occupant thereof to use such property free from interference." Va. Code § 18.2–121. The Restatement (Second) of Torts indicates "[a] trespass to chattels occurs when one party intentionally uses or intermeddles with personal property in rightful possession of another without authorization." *AOL v. IMS,* 24 F.Supp.2d 548, 550 (E.D.Va.1998) (citing Restatement (Second) of Torts § 217(b), and applying the section in a similar UBE case).

 Based on these authorities, it seems reasonable to define a trespass to chattels, under Virginia law, as any unauthorized interference with or use of the personal property of another. It also seems reasonable to adopt the Virginia standard for conversion in determining who has standing to assert trespass to chattels; that is, "An action for conversion [or trespass to chattels] can be maintained only by the person having a property interest in and entitled to the immediate possession of the item alleged to have been wrongfully converted [or trespassed upon]." *Economomopoulos v. Kolaitis,* 259 Va. 806, 528 S.E.2d 714, 719 (2000) (citing *United Leasing Corp. v. Thrift Ins. Corp.,* 247 Va. 299, 305, 440 S.E.2d 902, 906 (1994)). *See also Acorn Structures, Inc. v. Swantz,* 846 F.2d 923, 926 n. 1 (4th Cir. 1988) (quoting the Restatement (Second) of Torts § 228, as follows: "One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated").

On the issue of damages, the Virginia courts have spoken, noting "[o]ne who commits a trespass to a chattel is liable to its rightful possessor for actual damages suffered by reason of loss of its use." *Vines v. Branch,* 244 Va. 185, 190, 418 S.E.2d 890, 894 (1992) (citing *Zaslow v. Kroenert,* 29 Cal.2d 541, 551–52, 176 P.2d 1, 7 (1946)).

As noted previously, the court found at the April 17, 2000, hearing that Dayton's actions constituted trespass to chattels, and NHCD conceded for purposes of AOL's motion for summary judgment that AOL has established a *prima facie* case of trespass to chattels by Dayton. This again returns the court to the question, discussed below, of whether NHCD is liable for Dayton's actions. If the answer is in the affirmative, then AOL is entitled to summary judgment on this claim as a matter of law, with damages to be determined at trial.

### F. AOL's Claims of Civil Conspiracy

 AOL argues NHCD was involved in a conspiracy with its contract e-mailers,

among others, to violate the CFAA, VCCA, and commit trespass to chattels. (Doc. No. 1, Count VI; Doc. No. 38, § X) AOL correctly sets forth the elements of civil conspiracy as applied in the State of Virginia (Doc. No. 38, § X), to-wit: two or more persons engaged in concerted action either to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means, and resulting in damages. *See Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 249 Va. 39, 453 S.E.2d 261 (1995). However, the court, once again, first must decide the issue of whether or not the contract e-mailers were acting as NHCD's agents. If they were, then a civil conspiracy is not legally possible because a principal and its agents are, for this purpose, not separate entities. *See Perk v. Vector Resources Group, Ltd.*, 253 Va. 310, 485 S.E.2d 140 (1997). If the e-mailers were independent contractors, then AOL must show NHCD knowingly engaged in concerted action with the e-mailer that were *intended* to accomplish a criminal or unlawful purpose. The court finds, on the record before it, that AOL has not met this burden. Accordingly, either way, summary judgment on the civil conspiracy claim is denied.

### G. AOL's Claim of Unjust Enrichment

Count VII of AOL's Complaint states a claim for unjust enrichment, and seeks imposition of a constructive trust "on all monies received by [NHCD] as a result of its bulk e-mail activities." (Doc. No. 1, ¶ 86) "Unjust enrichment is a quasi-contract claim based upon the equitable remedy available when a recipient of a benefit obtains it under conditions where the receipt amounts to unjust enrichment." *Wright v. Cangiano*, Chancery No. 15084, 1993 WL 946172, at *1 (Va. Cir. Ct. July 20, 1993) (citing *Marine Dev. Corp. v. Rodak*, 225 Va. 137, 142, 300 S.E.2d 763 (1983)). It is a common-law doctrine that provides restitution in the situation where "one person is accountable to another on the ground that otherwise he would unjustly benefit or the other would unjustly

suffer loss." Restatement, Restitution, p. 1 (1937).

The doctrine has been recognized historically in Virginia:

An action for a contract implied in law is to remedy an unjust enrichment. The concept is found in Virginia law as early as *Lawson's Ex'r v. Lawson*, 57 Va. (16 Gratt.) 230, discussing the comparison of the concept of assumpsit[,] or an action to recover money of another had and received which the possessor had no right to retain[,] with contract implied in law. In more modern times (1919), the Virginia Supreme Court agreed that the action has been extended to "all cases in which the defendant is bound by ties of natural justice and equity to refund the money ... from the relation of the parties the law will imply a debt, and give this action, founded on the equity of the plaintiff's case, as it were, upon a contract—'quasi ex contractu' ... and upon this debt found the requisite undertaking to pay." *Rinehart v. Pirkey*, 126 Va. 346, 101 S.E. 353 (1919), citing with approval Clark on Contracts (1894 ed.) § 314, p. 757.

*May v. Rainsley Fin. Corp.*, 32 Va. Cir. 396, 1994 WL 1031067, at *1 (Va. Cir. Ct., Feb.28, 1994): As the Virginia Supreme Court has explained:

To avoid unjust enrichment, equity will effect a "contract implied in law," requiring one who accepts and receives the services of another to make reasonable compensation for those services. *See Marine Dev. Corp. v. Rodak*, 225 Va. 137, 142–44, 300 S.E.2d 763, 765–66 (1983); *Ricks v. Sumler*, 179 Va. 571, 577, 19 S.E.2d 889, 891 (1942); *Hendrickson v. Meredith*, 161 Va. 193, 200, 170 S.E. 602, 605 (1933). The liability to pay for the services is based on an implication of law that arises from the facts and circumstances presented, independent of agreement or presumed intention. *Marine Dev. Corp.*, 225 Va. at 142, 300 S.E.2d at 766; *Hendrickson*, 161 Va. at 200–01, 170 S.E. at 605. The promise

to pay is implied from the consideration received. *Id.*

*Po River Water & Sewer Co. v. Indian Acres Club of Thornburg, Inc.*, 255 Va. 108, 114, 495 S.E.2d 478, 482 (1998).

■ To recover on its claim for unjust enrichment, AOL must show:

(1) AOL conferred a benefit upon NHCD by rendering services or expending properties;

(2) AOL had a reasonable expectation of being compensated;

(3) The benefits were conferred at the express or implied request of NHCD; and

(4) If NHCD is allowed to retain the benefits without compensating AOL, then NHCD would be unjustly enriched.

*See Primrose Devel. Corp. v. Benchmark Acquisition Fund I L.P.*, No. 19161, 1998 W.L. 957312 (Va. Cir. Ct., Oct.29, 1998).

■ One remedy for unjust enrichment is imposition of a constructive trust. "A constructive trust is appropriately imposed to avoid unjust enrichment of a party." *Cooper v. Cooper*, 249 Va. 511, 517, 457 S.E.2d 88, 92 (1995) (citing *Leonard v. Counts*, 221 Va. 582, 589–90, 272 S.E.2d 190, 195–96 (1980)). Moreover,

> "Constructive trusts ... occur not only where property has been acquired by fraud or improper means, but also where it has been fairly and properly acquired, but it is contrary to the principles of equity that it should be retained, at least for the acquirer's own benefit."

*Rash v. Hilb, Rogal & Hamilton Co.*, 251 Va. 281, 287, 467 S.E.2d 791, 795 (1996) (citations and emphasis omitted). "[T]he burden of establishing the grounds for the imposition of a constructive trust [is] by clear and convincing evidence." *Hill v. Brooks*, 253 Va. 168, 174, 482 S.E.2d 816, 820 (1997). *Ruffin v. Ruffin*, Nos. 1792–99–1, 1804–99–1, 2000 W.L. 198078, at *2 (Va.Ct.App., Feb.22, 2000).

In considering AOL's claim for unjust enrichment and imposition of a constructive trust, the court notes *ab initio* that this claim involves crafting a remedy for AOL's loss. Rather than being an operative rule itself, unjust enrichment is "a principle which underlies many particular rules." Calamari & Perillo, CONTRACTS § 15–2 (3d ed.1987). On the record before the court, this appears to be a "situation[ ] in which one's sense of justice would urge that unjust enrichment has occurred, yet no relief is available." *Id.*

■ AOL's motion for summary judgment on this claim must fail for two reasons. First, AOL has failed, for summary judgment purposes, to meet the considerable burden of showing by clear and convincing evidence that it is entitled to relief from NHCD. Second, AOL has other remedies at law for any wrong NHCD is proven to have perpetrated on AOL. "The 'unjust' in 'unjust enrichment' refers to the lack of the plaintiff having a remedy at law for any wrong perpetrated on him by the defendant." *Wright, supra*, at *1.

AOL's motion for summary judgment on the basis of unjust enrichment is denied.

### H. NHCD's Liability for Acts of Its Contract E–Mailers

■ The court has found AOL is entitled to summary judgment on its claims for trespass to chattels and violation of the VCCA—*if* NHCD is responsible, in law or in equity, for the acts of its contract e-mailers. This requires a determination of whether the contract e-mailers who sent UBE through AOL's system were acting as NHCD's agents. Under Virginia law,

> [a]gency is defined as a fiduciary relationship arising from "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the agreement by the other so to act." *Allen v. Lindstrom*, 237 Va. 489, 496, 379 S.E.2d 450, 454 (1989) (quoting *Raney v. Barnes Lumber Corp.*, 195 Va. 956, 966, 81 S.E.2d 578, 584 (1954)); *accord State*

*Farm Mut. Auto. Ins. Co. v. Weisman,* 247 Va. 199, 203, 441 S.E.2d 16, 19 (1994); *Reistroffer v. Person,* 247 Va. 45, 48, 439 S.E.2d 376, 378 (1994). The party who alleges an agency relationship has the burden of proving it. *Weisman,* 247 Va. at 203, 441 S.E.2d at 19; *Allen,* 237 Va. at 496, 379 S.E.2d at 454.

*Hartzell Fan, Inc. v. Waco, Inc.,* 256 Va. 294, 300, 505 S.E.2d 196, 200 (1998).

The thorny problem for AOL in this case is proving the contract e-mailers were acting 'subject to NHCD's control.' Further,

> [a]n agency relationship is never presumed; to the contrary, the law presumes that a person is acting for himself and not as another's agent. Moreover, the party alleging an agency relationship bears the burden of proving it. Further, whether an agency relationship exists is a question to be resolved by the fact finder unless the existence of the relationship is shown by undisputed facts or by unambiguous written documents. [Citations omitted.]

*State Farm Mutual Auto. Ins. Co. v. Weisman,* 247 Va. 199, 203, 441 S.E.2d 16, 19 (1994).

While the evidence in this case strongly suggests the e-mailers were NHCD's agents, this is not a question that can be resolved on summary judgment. The question of whether the e-mailers were acting as NHCD's agents is one of fact— and, in this case, a material, disputed question of fact. The court finds AOL has failed, albeit only slightly, to show the e-mailers were acting as NHCD's agents. As a result, this issue remains for trial, and AOL's motion for summary judgment is **denied.**

### IV. CONCLUSION

Based upon the foregoing analysis, the court finds the plaintiff's motion for summary judgment should be **denied.** The court has not addressed in this opinion the additional constitutional claims raised by NHCD in its proposed Amended Answer and Counterclaim. NHCD's Motion (Doc. No. 70) to amend its Answer and Counterclaim is **granted.** The constitutional claims raised in the amended pleading will be addressed at trial.

**IT IS SO ORDERED.**