THURSTON METALS & SUPPLY COMPANY, INC.

V.

JOHN TIMOTHY TAYLOR

Record No. 821852

JOHN TIMOTHY TAYLOR

V.

THURSTON METALS & SUPPLY COMPANY, INC.

Record No. 821995

January 17, 1986

Present: All the Justices

476

*Wm. Rosenberger, Jr.* for appellant. (Record No. 821852)
*Robert E. Evans; Thomas L. Phillips (Kizer, Phillips & Petty,* on brief), for appellee. (Record No. 821852)

*Robert E. Evans; Thomas L. Phillips (Kizer, Phillips & Petty*, on brief), for appellant. (Record No. 821995)
*Wm. Rosenberger, Jr.* for appellee. (Record No. 821995)

COMPTON, J., delivered the opinion of the Court.

These two appeals stem from a single suit brought to recover damages for the loss of an eye in a golfing accident. The principal issues before us involve a claim of no primary negligence and a plea of release.

John Timothy Taylor was severely injured in 1980 while playing golf at Wintergreen in Nelson County. He was struck in the face by a golf club which had been in the control of Malcolm G. Thurston, an employee of Thurston Metals & Supply Company, Inc. This tort action was filed by Taylor in 1981 against Thurston and the company.

Three days before the June 1982 trial began, a draft for $100,000 was forwarded on behalf of Thurston individually to plaintiff's counsel following settlement discussions. On the morning of trial, the trial court entered an order of nonsuit dismissing the plaintiff's action against the individual defendant. The corporate defendant then filed a plea of release. The court refused to rule on the plea at that time and directed the trial to proceed against the remaining defendant. After a trial on the merits of the plaintiff's action, a jury returned a verdict for $200,000 in compensatory damages against the corporation.

Subsequently, the trial court conducted a hearing in July 1982 on the plea of release. The plea was denied and the court entered judgment on the verdict in August 1982, subject to a credit of $100,000.

We awarded the corporate defendant an appeal from the judgment order. We granted the plaintiff a separate appeal. He contests the allowance of the credit, but only if we hold that the trial court erred in its ruling on the plea of release. In the view we take of the case, it will be unnecessary to discuss further the plaintiff's appeal.

There are no material evidentiary conflicts. Malcolm Thurston was president of the Thurston corporation and its "only director," as well as an employee. The corporation, with approximately 200 customers, supplied specialty metals to those who had a particular use for its product.

As had been his habit, Thurston arranged to entertain several customers of his business over the weekend of September 26-28, 1980, with the cost to be borne by the corporation. According to Thurston, the purpose of such entertainment was to create good public and customer relations for his company. Thurston invited Bernie Brown, Harry Preble, and Wyatt Skinnell to spend the period in question at Thurston's condominium at Wintergreen. Preble was a buyer for Babcock and Wilcox, a company that purchased "metals, components, [and] parts for reactors" from the Thurston company. Brown was Preble's "boss," the purchasing manager for the division in which Preble worked. Skinnell was the auditor for Thurston Company.

Because Brown was unable to spend the entire period with the group, plaintiff Taylor accepted Preble's invitation to complete the foursome by coming to Wintergreen on Saturday, September 27, from his home in the Lynchburg area. Taylor, a stockbroker, knew Thurston and "how he does business." When Taylor learned of the other persons invited, he assumed that the Thurston company would pay his expenses and "take care of everything."

Thurston testified that Brown's leaving had no effect on the purpose of the weekend affair because he believed that, by entertaining Preble, Thurston's company would benefit. Thurston said that, by including the plaintiff as a substitute for Brown, he was trying to accommodate Preble's desire to have four people there for the whole weekend in order to provide a foursome for golf. Thurston testified that he intended for his corporation to bear the plaintiff's weekend costs and that the company did, in fact, pay for Taylor's expenses as a guest of the corporation.

After the plaintiff arrived on Saturday, the group played an uneventful round of golf at the Wintergreen course. On Sunday, the day of the incident, the group arrived at the golf course about 8:00 a.m. They began to play another 18-hole round, using golf carts for transportation. At the second hole, Thurston gave the other three players golf hats with "Thurston Metals" written on them. Nothing else significant happened until the foursome reached the tee for the fifth hole. The record does not show the distance from tee to green, anything about the design of the fifth fairway, or whether par for the hole is three, four, or five strokes.

According to the testimony, Thurston was the last person in the group at the fifth hole to drive a ball from the teeing ground, the starting place for the hole to be played. Thurston was 44 years of

age, had been playing golf regularly for 16 years, had never received a golf lesson from a professional, carried a thirty handicap, and seldom scored below 100 for an 18-hole round. Using a 2-iron, Thurston "knocked one ball into the woods and put up another one and knocked that into the woods," according to Preble's testimony. Preble further stated: "And then he took a practice swing, with no ball there, and he lost control of the club at the top of the swing through his wrist action, and for whatever reason it came back to the tee box, passed me, and hit Mr. Taylor in the head." According to the evidence, the plaintiff was standing about 20 feet to the rear and left of Thurston. Preble was to the plaintiff's left and about 15 feet to the rear of Thurston. Skinnell was sitting in the golf cart at some unspecified distance from the teeing ground.

The plaintiff, 33 years of age at the time of trial, testified that from his position to the left and behind Thurston he observed Thurston hit two balls "into the woods." Expecting Thurston either to hit a third ball or proceed to search for the ones he had hit, Taylor began to turn and walk to a golf cart when he was struck by the club which he did not see. According to Taylor, it is customary for a player to take "practice swings" before and not after he strikes a ball. As a result of the damage caused by the blow to Taylor's head, his right eye eventually was removed and replaced by a prosthetic device.

Thurston, a right-handed golfer, testified: "After the second shot, I was lining up as a swing, a golf swing, and would take a practice swing, and it was a full swing as a practice swing, and when I came around the club slipped out of my hands and over my left shoulder." Thurston stated he did not have time to warn Taylor. He said that after he saw the club had struck the plaintiff, he ran to him, and said, " 'My God, what happened? The club slipped out of my hands.' " The record shows that Thurston was wearing cleated golf shoes but it does not reveal whether he was wearing a golf glove. He testified that at the time of the last swing of the club he did not believe his foot slipped and that he was "still in a stable position." Also, Thurston testified that his golf swing usually is "harder" than the normal swing and that the swing in question had as much velocity as his previous swings at the balls. Plaintiff was unable to state whether the club in flight travelled "like a spear" or "around and around."

Over defendant's objection, the plaintiff presented expert testimony from Phillip Owenby, the head golf professional at a Lynchburg country club. Among other things, Owenby testified that "normally" it is not customary for a golfer to make practice swings after hitting a golf shot. He stated that after a player strikes the ball, the club is held, not voluntarily released, and then returned to the golf bag. In addition, the expert demonstrated a normal, full golf swing for the jury.

At the conclusion of the evidence, the trial court ruled as matters of law that Thurston was an agent of the corporate defendant acting within the scope of his authority and that the plaintiff was not guilty of either assumption of the risk or contributory negligence. Thus, the only issues of fact presented to the jury were primary negligence, proximate cause, and damages.

On appeal, defendant argues that the plaintiff failed to carry the burden of proof of negligence. The corporation contends the testimony "merely showed that an accident occurred when the golf club slipped from the hands of the player." According to the argument, there was "nothing to show how or why the club slipped from [Thurston's] hands." We disagree.

█ On appeal, when reviewing a trial court's action in confirming a jury verdict, the judgment below will not be disturbed when supported by credible evidence, or if reasonable persons may differ on the inferences to be drawn from the evidence. Only when fair-minded persons can reach but one conclusion from the facts will the question become one of law for the appellate court. *Indian Acres* v. *Denion*, 215 Va. 847, 850, 213 S.E.2d 797, 799 (1975).

█ The basic rule of law applicable to golfers is that a player upon a golf course must exercise reasonable care in playing the game to prevent injury to others. Fulfillment of that duty is measured by the surrounding facts and circumstances of each case. *Alexander* v. *Wrenn*, 158 Va. 486, 491, 164 S.E. 715, 716 (1932) (jury question on defendant's negligence presented when golfer injured by ball struck by defendant, who had not called "fore"). *See generally* annot., "Liability for Injury or Death On or Near Golf Course," 82 A.L.R.2d 1183. Under the circumstances of this case, Thurston had the duty to exercise reasonable care in controlling his golf club so that it would not fly from his hands in the course of a swing. The plaintiff presented credible evidence sufficient to raise a question for the jury upon whether Thurston violated that duty.

Thurston, not an expert golfer, possessed a golf swing that was frantic, unconventional, and violent. In Thurston's words, "I swing fairly strong at the ball . . . I don't have a real fancy swing like the golf pro . . . demonstrated as a swing. I just have kind of an unorthodox type swing, I guess." Nevertheless, aware of this propensity, Thurston performed a "practice swing" without a ball in place, using as much velocity and gusto as he had employed when he was attempting to strike the two balls. In the course of the "practice" movement, Thurston violated the customary requirement that a golfer maintain control of the club throughout the swing. A mere statement to the effect that, "Oops, it slipped," is not sufficient an explanation to prevent the issue from becoming one of fact for the jury.

Under these circumstances, the plaintiff established a prima facie case of negligence when he showed that a golfer of Thurston's limited ability, who possessed an unorthodox and vigorous swing, released the club during a practice swing "through his wrist action," after hitting two balls into nearby woods. It could be reasonably inferred from this evidence that the incident occurred because Thurston, irritated after hitting two shots astray, flailed at an imaginary ball without exercising proper care to maintain a firm grip on the club. The burden of going forward with the evidence on the issue of negligence then shifted to the defendant. And it was for the jury to say, from all the evidence, whether the loss of control could have been avoided in the exercise of ordinary care.

The defendant wisely does not vigorously press its contentions that expert testimony on conduct and custom in the game of golf was improperly admitted, that the court erred in ruling Thurston was acting as an agent of the corporation at the time of the negligent act, and that instructions on contributory negligence and assumption of the risk were improperly refused. None of those contentions has any merit.

Golfing etiquette, rules, and customs are not matters of such common knowledge that a lay juror can form as intelligent and accurate opinion on the subject as can an expert witness. On the agency question, we find the undisputed evidence to be that Thurston was employed by his corporation as its president, that he planned the weekend in question with the intention that the activities would benefit his corporation, and that he considered the plaintiff a guest of the company at the time of the injury. Regard-

ing the plaintiff's conduct, we conclude, again from the uncontradicted evidence, that the plaintiff was standing at an appropriate and apparently safe distance to the rear of Thurston at the time Thurston was performing at the front of the teeing ground. Thus, there was no evidence upon which the jury could have based a finding of either contributory negligence or assumption of risk.

■ We turn to the issues raised by the plea of release. The plaintiff sued for $2.5 million in compensatory damages. His lowest demand for settlement was $350,000. Attorney James F. Johnson represented the insurer carrying the "homeowner's" liability coverage on Thurston individually. That policy limit was $100,000. Attorney William Rosenberger, Jr., trial counsel for the corporate defendant, represented the insurer carrying the liability coverage on the corporation. The limit of liability in that policy was $300,000. Attorney Henry M. Sackett, III, represented both defendants for the potential individual liability in excess of the limits of the respective policies.

On the Friday before the trial began on Monday, Johnson agreed to pay his client's policy limit of $100,000 in response to the plaintiff's settlement demand. Sackett urged the insurer for Thurston Metals to pay the difference of $250,000 to settle the case but Rosenberger's client refused. On Friday, Johnson sent the $100,000 draft to plaintiff's counsel by mail. He also forwarded a covenant not to sue to be executed by the plaintiff. The plaintiff did not endorse the draft or execute the document until after the trial.

The undisputed testimony showed that the attorneys for the plaintiff, attorney Johnson, attorney Sackett, the plaintiff, and Thurston all understood that the following agreement existed when the draft for $100,000 was forwarded to the plaintiff: The homeowners insurer decided to pay its full coverage in return for the execution of a covenant not to sue and a nonsuit of Thurston individually. Further, the parties understood that the plaintiff would not release his claim against the corporate defendant and that the case would proceed to trial against the company.

In denying the corporation's plea of release, the trial judge ruled that the plaintiff and both defendants were parties to an undisputed oral agreement that the case would proceed against the corporation. The court also noted that all the terms of the agreement eventually were fulfilled. Deciding the covenant-not-to-sue statute, Code § 8.01-35.1 (first enacted in 1979), was applicable,

the court held there had been no release of the plaintiff's claim against the corporation but that the amount of the verdict of $200,000 should be reduced by the amount paid by the homeowners insurer, according to the statutory provisions.*

On appeal, the defendant argues the agreement "to release" the agent released the employer. It contends the Thurston company was not a joint tort-feasor with Thurston, the agent, and that the corporation committed no act except through the agent. It maintains that the application of § 8.01-35.1 is limited to joint tort-feasors and, therefore, does not apply here. It argues that when the plaintiff agreed to accept the $100,000 and to give a covenant not to sue to Thurston individually, the action against the corporation was extinguished by operation of law, the intent of the parties to the contrary notwithstanding. We disagree.

We hold that the application of Code § 8.01-35.1 is not limited to "joint tort-feasors," as that term is narrowly defined, but that the statute also applies to those vicariously liable as employers, masters, and principals. Pertinent to this case, the statute provides that "[w]hen a . . . covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury . . . [i]t shall not discharge any of the other tort feasors from liability for the injury . . . ." Certainly, the defendant corporation, as employer, is liable in tort for the plaintiff's injury, albeit vicariously through the acts of its employee. In Virginia, employers and employees are deemed to be jointly liable and jointly suable for the

---

*As pertinent here, Code § 8.01-35.1 (Cum. Supp. 1981) provided, on the date this cause of action arose and on the date of this agreement, as follows:

"§ 8.01-35.1. Effect of release or covenant not to sue in respect to liability and contribution among joint tort feasors. - A. When a release or a covenant not to sue is given in good faith to one of two or more persons liable in tort for the same injury, or the same property damage or the same wrongful death:

1. It shall not discharge any of the other tort feasors from liability for the injury, property damage or wrongful death unless its terms so provide; but any amount recovered against the other tort feasors or any one of them shall be reduced by any amount stipulated by the covenant, or in the amount of the consideration paid for it, whichever is the greater; and

2. It shall discharge the tort feasor to whom it is given from all liability or contribution to any other tort feasor.

B. A tort feasor who enters into a release or covenant not to sue with a claimant is not entitled to recover by way of contribution from another tort feasor whose liability for the injury, property damage or wrongful death is not extinguished by the release or covenant not to sue, nor in respect to any amount paid by the tort feasor which is in excess of what was reasonable . . . ."

employee's wrongful act. *McLaughlin* v. *Siegel*, 166 Va. 374, 376, 185 S.E. 873, 873 (1936). Moreover, the corporate employer falls within the accepted definition of a "tort-feasor," one who is guilty of a tort. Black's Law Dictionary 1335 (5th ed. 1979).

Furthermore, nowhere in the substantive language of the statute is the term "joint tort-feasor" used. Since its enactment in 1979, some codified versions of the statute have contained the term in the headlines. See Cumulative Supplements for Volume 2 of the Code for 1979, 1980, 1981, 1982, and 1983. Other codified versions of the statute contain no reference to the term in the headlines. See 1984 Replacement Volume 2 and 1985 Cumulative Supplement for Volume 2 of the Code. Nonetheless, by statutory mandate the headlines of the several Code sections are intended as mere catchwords to indicate the contents of the sections and do not control construction of the statute. *See* Code § 1-13.9.

We have not overlooked the fact that the legislative title (as opposed to the codifier's headline) of the original 1979 enactment, as well as the 1982 and 1983 amendments, contained the phrase "joint tort feasors." Acts 1979, ch. 697; Acts 1982, ch. 196; Acts 1983, ch. 181. For example, the 1979 title was: "An Act to amend the Code of Virginia by adding a section numbered 8.01-35.1, relating to releases and covenants not to sue as joint tort feasors." However, the title of the 1980 and the 1985 amendments contain no reference to the term. Acts 1980, ch. 411; Acts 1985, ch. 330. For example, the 1980 title was: "An Act to amend and reenact § 8.01-35.1 of the Code of Virginia, which provides how releases or covenants not to sue may discharge certain tort feasors." In any event, the inclusion of a reference to "joint tort feasors" in the title of the several Acts does not make our decision to apply the statute to those vicariously liable a constitutionally impermissible extension of the bounds of the Act.

Article IV, § 12 of the Constitution of Virginia provides, in part: "No law shall embrace more than one object, which shall be expressed in its title." The purpose of the constitutional provision is to prevent the members of the General Assembly and the people from being misled by the title of a law. "It was intended to prevent the use of deceptive titles as a cover for vicious legislation, to prevent the practice of bringing together into one bill for corrupt purposes subjects diverse and dissimilar in their nature, and having no necessary connection with each other. . . ." *Commonwealth* v. *Brown*, 91 Va. 762, 771-72, 21 S.E. 357, 360 (1895). On

the other hand, the constitutional provision was not designed to prohibit incorporation of the entire statutory law upon a subject into a single enactment. "Although the act or statute authorizes many things of a diverse nature to be done, the title will be sufficient if the things authorized may be fairly regarded as in furtherance of the object expressed in the title." *Id*. at 772, 21 S.E. at 360. Accordingly, our application of the plain words of the substantive language of the statute to those vicariously liable, even though they technically are not joint tort-feasors, is not at odds with the constitution because it is in furtherance of the purpose of the enactment, which is to encourage settlements. See *Hayman v. Patio Products, Inc.*, 226 Va. 482, 487, 311 S.E.2d 752, 756 (1984), where we discussed the statute as applied to joint tort-feasors, there being no issue whether it applied to those vicariously liable.

Consequently, the trial court was correct in overruling the plea of release, applying Code § 8.01-35.1 to the agreement in question. *See Harris v. Aluminum Company of America*, 550 F.Supp. 1024, 1029-31 (W.D. Va. 1982); *Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 928-30 (Alaska 1977); Comment, *Covenant Not to Sue*, 14 U.Rich.L.Rev. 809 (1980).

It follows that the court likewise was correct in ordering a credit of $100,000 on the $200,000 verdict, in accordance with the statutory provision that "any amount recovered against the other tort feasors or any one of them shall be reduced by any amount stipulated by the covenant . . . ."

For these reasons, the judgment below will be affirmed.

*Record No. 821852 - Affirmed.*
*Record No. 821995 - Affirmed.*