**AMERICA ONLINE, INC., Plaintiff,**

v.

**NATIONAL HEALTH CARE DISCOUNT, INCORPORATED, Defendant.**

**No. C98–4111–PAZ.**

United States District Court,
N.D. Iowa,
Western Division.

Aug. 20, 2001.

F Richard Lyford, Richard A Malm, Bret Alan Dublinske, Dickinson Mackaman Tyler & Hagen PC, Des Moines, IA, for America Online.

Daniel L Hartnett, Crary-Huff-Inkster-Hecht-Sheehan-Ringenberg-Hartnett-Storm, Sioux City, IA, for National Health Care Discount, Inc.

## MEMORANDUM OPINION AND ORDER FOLLOWING TRIAL ON THE MERITS

ZOSS, United States Magistrate Judge.

TABLE OF CONTENTS

I. INTRODUCTION ...............................................892

II. PROCEDURAL HISTORY ........................................892

III. FINDINGS OF FACTS .........................................894

IV. LEGAL ANALYSIS ............................................897
 A. NHCD s Liability for the Acts of Its Contract E–Mailers .................897
 B. AOL's Claim Under the CFAA .......................................898
 C. AOL's Claim of Civil Conspiracy .......................................899
 D. Damages and Other Relief ...........................................900

V. PERMANENT INJUNCTION .....................................902

VI. CONCLUSION ...............................................902

## I. INTRODUCTION

This Lawsuit involves the sending of unsolicited bulk electronic mail ("e-mail") messages[1] over the Internet to unsuspecting, and in most cases annoyed, e-mail recipients. During the period relevant to this lawsuit, a large volume of unsolicited e-mail messages was sent to Internet users by individuals acting on behalf of the defendant National Health Care Discount, Incorporated ("NHCD"). Despite extensive and costly efforts by the plaintiff America Online, Inc. ("AOL") to block such messages, a significant percentage of the messages was delivered through AOL's computers to its members.

AOL is an Internet Service Provider ("ISP") that also provides a variety of other computer-related services to its members. The services provided by AOL include the transmission of e-mail messages to and from its members and across the Internet. NHCD is engaged in the business of selling discount optical and dental service plans. At times relevant to this lawsuit, a large volume of e-mail messages was sent through AOL's computer system to AOL members to generate leads for NHCD's products. NHCD argues the

e-mail messages were sent by independent contractors ("e-mailers"), and NHCD cannot be held responsible for their actions. NHCD also argues the activities of the e-mailers were entirely proper.

The threshold question in this case is whether NHCD is liable to AOL for the actions of the individuals who sent a large volume of unsolicited bulk e-mail ("UBE") on NHCD's behalf to AOL's members. If the answer to this question is "yes," then the court must determine whether NHCD is liable under state law[2] or federal law for damages suffered by AOL, as the ISP saddled with the responsibility for delivering the senders' UBE, and if so, what damages and other relief AOL is entitled to recover from NHCD.

## II. PROCEDURAL HISTORY

This case was commenced on December 18, 1998, when AOL filed a seven-count Complaint against NHCD alleging the following causes of action:

Count I: Violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* ("CFAA");

---

1. Such messages are variously referred to as unsolicited commercial e-mail ("UCE"), unsolicited bulk e-mail ("UBE"), junk e-mail, and "spam."

2. The court previously held Virginia law applies in this case. *See America Online, Inc. v. National Health Care Discount, Inc.,* 121 F.Supp.2d 1255, 1270 (N.D.Iowa 2000).

Count II: Dilution of interest in service marks, in violation of 15 U.S.C. § 1125(c)(1);

Count III: Violations of the Virginia and Iowa Computer Crimes Acts, Virginia Code Annotated § 18.2–152.1 *et seq.*, and Iowa Code, Chapter 716A;

Count IV: Violation of Washington's Commercial Electronic Mail Act, Washington Revised Code Annotated, title 19, chapter 19.190, and the Washington Consumer Protection Act, Washington Revised Code Annotated, title 19, chapter 19.86;

Count V: Conversion of or trespass to chattels under the common law;

Count VI: Civil conspiracy; and

Count VII: Unjust enrichment.

AOL prayed for compensatory and statutory damages, punitive damages, preliminary and permanent injunctive relief, attorney fees, and costs. NHCD answered the Complaint by generally denying liability on all counts and asserting nine affirmative defenses, including the following: (1) "Any loss, injury, or damage incurred by AOL was proximately caused by the acts of third parties who[m] NHCD neither controlled nor had the right to control, and was not proximately caused by any acts, omissions, or other conduct of NHCD"; and (2) "should AOL prove any of the allegations in the Complaint, the mailing of any bulk electronic mail advertisement was performed by an independent contractor(s) [for] whose actions NHCD is not liable."[3] NHCD filed a counterclaim along with its answer.

On April 16, 1999, the parties consented to jurisdiction over this case by a United States Magistrate Judge, and on April 19, 1999, the Honorable Donald E. O'Brien signed an order transferring the case to United States Magistrate Judge Paul A. Zoss.

On January 10, 1999, AOL filed a motion for partial summary judgment relating to several counts in the Complaint. The motion was resisted by NHCD. The court ruled as follows on the issues raised in the motion: (1) the actions of NHCD's e-mailers constituted trespass to chattels; (2) triable issues of fact remained concerning whether AOL should prevail on its claims under the CFAA; (3) NHCD's e-mailers violated the Virginia Computer Crimes Act ("VCCA"); (4) triable issues of fact prevented summary judgment in favor of AOL on its claim of civil conspiracy; and (5) AOL was not entitled to summary judgment on its claim of unjust enrichment. *America Online, Inc. v. National Health Care Discount, Inc. ("America Online"),* 121 F.Supp.2d 1255, 1271–76, 1278–80 (N.D.Iowa 2000). The court further held AOL was entitled to judgment against NHCD on its claims of trespass to chattels (conversion) and violation of the VCCA, but only if the court were to find at trial that NHCD was responsible for the acts of its e-mailers. *Id.* at 1276–77.

In the final pretrial order prepared by the parties prior to trial, AOL specifically withdrew its claims under Counts II and IV of the Complaint, and advanced only the following claims for trial: (1) the CFAA claim in Count I; (2) the VCCA claim in Count III; (3) the trespass to chattels (conversion) claim in Count V; and (4) the civil conspiracy claim in Count VI. The court considers AOL's remaining claims to have been abandoned.[4] In the

---

**3.** The remaining affirmative defenses were not supported by evidence submitted at trial, and were neither briefed nor argued. The court considers them to have been abandoned.

**4.** The abandoned claims are those for violation of the Iowa Computer Crimes Act (Count I), and unjust enrichment (Count VII).

final pretrial order approved by the parties, NHCD withdrew its counterclaim, but listed the following two additional issues in the case:

1. Whether AOL's litigation against Forrest Dayton and other parties in the U.S. District Court for the Eastern Division of Virginia involving claims identical to those asserted in this action bar the prosecution of this action under the principles of *res judicata.*

2. Whether the settlement agreement and mutual release entered into between AOL and Dayton, et al., released NHCD from any and all claims or causes of action which AOL may have, or ever claim to have, against AOL regarding the facts surrounding this action (see ¶ 19 of the settlement agreement and mutual release).

Doc. No 92, p. 7. These claims were neither briefed nor argued, so the court considers them to have been abandoned; however, the effect of the AOL/Dayton settlement agreement will be relevant to consideration of the amount of damages AOL is entitled to recover from NHCD.

The case was tried to the court on April 30 and May 2 and 3, 2001. Post-trial briefs were filed by the parties, and on July 18, 2001, the court heard final arguments. Additional submissions, addressing the effect of the AOL/Dayton settlement on the calculation of damages, were filed by NHCD on August 1, 2001, and by AOL on August 2, 2001. The court now considers the case to be fully submitted.

### III. FINDINGS OF FACTS

The facts found by the court in its ruling on the cross-motions for summary judgment were confirmed by the evidence submitted at trial, and will not be repeated here at length. *See America Online,* 121 F.Supp.2d at 1259–68. The court makes the following additional findings relevant to the issues addressed at trial.

In the spring of 1997, Hermann Wilms, an NHCD vice president, received several unsolicited commercial e-mail messages over the Internet, and decided to explore whether commercial e-mail could be used to generate leads for NHCD. After unsuccessful efforts working with two e-mailers, he came into contact with an e-mailer named Forrest Dayton. Dayton was an experienced e-mailer who had developed software to harvest e-mail addresses and quickly send out massive quantities of UBE. This software employed methods to falsify and obscure certain characteristics of e-mail messages to avoid UBE filters employed by AOL and other ISPs. Dayton agreed to do a test run of one million pieces of commercial e-mail for NHCD for a fee of $600.

On August 29, 1997, Wilms e-mailed Dayton the following instructions concerning the test:

> If your results are not over 1%, I would attribute it to the subject. The term "insurance" is a turn off and probably a number of people will delete the message and not read it. We discovered that early on. The very best results we get is when we put into the subject box only the words … Dental Plan.

> We run approx 3,000 leads per week from our predictive-dialers and salaried personnel for these past 7 years and that script I sent you is word for word. The only change is in the SUBJECT BOX.

> If the results are poor, you may want to re-run to get a true indicator.

As a postscript, Wilms stated, "The 'shelflife' on the leads is short, so if you could forward to my AOL account daily, I would appreciate it."

On September 1, 1997, Wilms sent Dayton an e-mail that stated, "Dental Plan in subject box is good for ½%. From our experience all you need are those 2 words . . . nothing else." [5] Wilms asked Dayton to use the following "script":

Hello, we work with a group of your local doctors and dentists and are offering a Dental–Optical Plan that runs approximately $2 a week for an individual and $3 a week for the entire family with no limit to the number of children.

Would you like our office to furnish you with the details?

Our doctors are grouped by area code and zip code, therefore please list your name, address, area code and phone number.

Thank you.

Following these instructions, Dayton performed an initial "test" e-mailing in late August and early September 1997, purportedly consisting of one million pieces of UBE.[6] On September 14, 1997, Wilms sent Dayton an e-mail stating the following:

Based on what the promo has produced, you can see that 1 million hits per week will yield approx .1,000 leads. This is what I will offer:

I will pay you each week $1 per lead with 'phone number' (at first we will have to cap it at 1,000 leads or $1,000 per week until the offices can absorb the leads) and the lead is not more than 1 week old.

If you are interested in pursuing this, please email me.

This arrangement was put in place, and Dayton began providing leads to NHCD.

A few weeks later, Wilms and Dayton began discussing whether to increase the number of leads Dayton provided to NHCD each week. On October 6, 1997, Wilms sent Dayton an e-mail which stated the following:

After talking with you last night, I think we can do some increasing, however, if you were to do too much at one time you run the risk of being shut down and then we also have too many leads to work at one time . . . so we have to find a balance.

Later, in an e-mail sent to Dayton on October 13, 1997, Wilms asked "Can you send out more with less risk of shutdown?"

Wilms gave several innocent explanations for his repeated references to the possibility of Dayton "being shut down," but the court finds Wilms actually was expressing his concern that if Dayton sent out too much e-mail, then ISPs such as AOL would catch onto Dayton's tactics and eliminate his ability to send out UBE on behalf of NHCD.

In 1997, 1998, and 1999, NHCD employed a total of twenty e-mailers to generate leads. Some of these e-mailers worked directly with NHCD, while others worked for NHCD through Dayton.

On April 15, 1998, Wilms asked Dayton to provide 2,000 leads per week, but Dayton was unable to comply. On May 12, 1998, Wilms sent Dayton an e-mail requesting that Dayton provide 4,000 leads per week. In an e-mail to Wilms dated June 9, 1998, Dayton stated, "I got 500,000 out this morning with all tests came through. Will do 500k tonight." Wilms responded with an e-mail stating, "I'll be happy with 2,000 to 3,000 for now!" In a postscript to that e-mail, Wilms stated,

---

**5.** At trial, Wilms testified these representations to Dayton were untrue, and NHCD actually had no previous experience sending UBE.

**6.** The evidence at trial strongly suggested Dayton overstated the number of e-mail messages he actually sent out in this test mailing.

"These 'against email' fanatics think this stuff is free!!"

On July 1, 1998, Charles D. Curran, an attorney for AOL, wrote a letter to NHCD, stating the following:

On behalf of America Online, Inc. ("AOL"), I am writing to demand that you, your companies, and any of your agents immediately cease and desist from your practice of transmitting, distributing and facilitating the distribution of unsolicited bulk e-mail ("UBE") to AOL and its members.... Your transmissions of UBE to AOL and its members have resulted in numerous complaints, and have been accompanied by a variety of fraudulent practices....

On July 16, 1998, Anne M. Breitkreutz, an attorney representing NHCD, wrote to Curran and stated the following:

NHCD buys leads from independent contractors who generate these leads from direct mail, newspapers, radio, TV, telemarketing and the Internet. They buy the leads in bulk at so much per lead. NHCD cannot impose any restrictions or give directions on how these independent contractors procure these leads.... NHCD will forward your letter of July 1, 1998 on to its independent e-mailers, ... I believe this should address your concerns expressed in the letter dated July 1, 1998.

Despite Breitkreutz's representations, no notice of any kind was sent to NHCD's e-mailers.

On August 13, 1998, Curran wrote a second letter to NHCD, requesting NHCD to identify the parties responsible for sending NHCD's UBE, and asking that AOL be provided with a copy of NHCD's policies concerning "spam." NHCD ignored this letter. The present lawsuit was commenced on December 18, 1998.

On March 18, 1999, Wilms sent Dayton an e-mail in which he stated the following: "In today's USA Today the big antispam device is *Sendmail*, is that a big deal?" Wilms testified he sent this e-mail message to Dayton "[b]ecause [Dayton] must have been complaining [that he would not] be in business much longer, something like that." Wilms said he was unfamiliar with anti-spam devices. The court finds this testimony not to be credible. From early on in NHCD's UBE program, Wilms was aware AOL and other ISPs were attempting to reduce or eliminate UBE from their systems, but nevertheless pressured Dayton and NHCD's other e-mailers to increase their production of e-mail generated leads. The court finds Wilms was well aware that his e-mailers were the subject of anti-spam efforts by ISPs such as AOL, and he sent this e-mail message to Dayton to inquire as to the status of the e-mailers' attempts to thwart those efforts.

This concludes the factual findings with respect to the issues tried to the court, save one. To calculate damages in this case, the court must make a factual finding concerning the amount of UBE that NHCD's e-mailers sent to AOL members. There are no records that directly establish this figure, but several methods have been suggested by the parties to deduce an answer. From 1997 through May 30, 1999, NHCD's e-mailers supplied NHCD with nearly 460,000 leads. During this same period, AOL received numerous complaints from its members about UBE being sent by e-mailers acting on behalf of NHCD. AOL members were instructed to forward complaints about UBE to TOSSPAM, a database set up by AOL for the purpose of tracking UBE. Approximately 180,000 separate complaints concerning NHCD's UBE[7] were forwarded to the TOSSPAM database by AOL members.

7. The record does not reflect the exact num- ber of member complaints sent to TOSSPAM.

AOL argues the total amount of UBE sent on behalf of NHCD to AOL members during the period relevant to this lawsuit can be extrapolated either (1) from the number of leads generated by NHCD's e-mailers during the relevant period (*i.e.*, 460,000), or (2) from the number of complaints forwarded to the TOSSPAM database by AOL members during the relevant period (*i.e.*, 180,000). The evidence submitted at trial suggests the ratio of e-mails sent to leads generated was 600:1.[8] This would indicate 276 million pieces of UBE (600 times 460,000) were sent out by NHCD's e-mailers during the period covered by this action. The court finds that if e-mailers sent out 276 million pieces of UBE on behalf of NHCD, about 150 million of the messages would have been sent to AOL members. The evidence also suggests the proper ratio of the amount of UBE sent to AOL members on behalf of NHCD during the relevant period to the number of complaints forwarded to TOSSPAM during the same period was 700:1.[9] This would indicate 126 million pieces of NHCD's UBE (700 times 180,000) were sent to AOL members during the period covered by this action.

Reconciling these two approaches, the court finds NHCD's e-mailers, acting on behalf of NHCD, sent 135 million pieces of UBE to AOL members during the period relevant to this lawsuit. The court will use this number to calculate damages, as discussed in Section IV.D., *infra.*

## IV. LEGAL ANALYSIS

### A. NHCD's Liability for the Acts of Its Contract E–Mailers

█ The court turns first to the question of whether NHCD is liable for the actions of its e-mailers. If so, then NHCD is liable to AOL for any damages awarded as the result of those e-mailers' actions.

In its prior opinion on summary judgment, the court set forth Virginia law defining agency. *See America Online*, 121 F.Supp.2d at 1279 (citing *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294, 300, 505 S.E.2d 196, 200 (1998); *State Farm Mut. Auto. Ins. Co. v. Weisman*, 247 Va. 199, 203, 441 S.E.2d 16, 19 (1994)). The court noted in its order that "the evidence in this case strongly suggests the e-mailers were NHCD's agents," but AOL had "failed, albeit only slightly, to show the e-mailers were acting as NHCD's agents." 121 F.Supp.2d at 1279. The court now holds the evidence at trial established as a matter of law that the e-mailers were acting as NHCD's agents. Therefore, NHCD will be liable to AOL for any damages awarded

In exhibits submitted at trial, AOL attempted to extract from the TOSSPAM database those complaints that concerned UBE sent to AOL members to generate leads for NHCD. For several reasons, this process was not exact. Data for eighteen weeks of the relevant period was not available from the database, so complaints received during those weeks could not be tracked. Also, complaints extracted from the database and attributed to NHCD were, in some cases, duplicative, erroneously attributed to NHCD, or made by non-AOL members. Taking all of these factors into account, the court finds that, during the relevant period, approximately 180,000 separate complaints concerning NHCD's UBE were for-

warded to the TOSSPAM database by AOL members.

8. AOL argues 1000:1 is the appropriate ratio of the pieces of e-mail sent out to leads generated. This calculation relies on the questionable veracity of Dayton, who stated that he sent out 1000 pieces of e-mail to generate each lead. The court finds this estimate was inflated by Dayton to justify the fees he charged, and finds 600:1 is a more accurate ratio.

9. Again, the argument for a higher ratio relies on the questionable veracity of e-mailers.

due to the acts of the e-mailers.[8]

### B. AOL's Claim Under the CFAA

■ AOL argues the evidence in this case is sufficient to establish NHCD's liability to AOL under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* Specifically, AOL argues NHCD violated 18 U.S.C. §§ 1030(a)(5) and (a)(2)(C).

Title 18 U.S.C. § 1030(a)(5) prohibits a person or entity from:

(A) knowingly caus[ing] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally caus[ing] damage without authorization, to a protected computer;

(B) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, recklessly caus[ing] damage; or

(C) intentionally access[ing] a protected computer without authorization, and as a result of such conduct, caus[ing] damage[.]

18 U.S.C. § 1030(a)(5).

Section Title 18 U.S.C. § 1030(a)(2)(C) prohibits a person or entity from:

(2) intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing]—

(C) information from any protected computer if the conduct involved an interstate or foreign communication[.]

18 U.S.C. § 1030(a)(2)(C).

Civil causes of action to assert claims under these provisions are available under subsection 1030(g), which provides, "Any person who suffers damage or loss by reason of a violation [of section 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

Turning first to subsection 1030(a)(5)(A), the elements of a civil claim under that subsection are as follows: (1) the person or entity must intentionally cause the transmission of a program, information, code, or command; (2) the computer must be a "protected computer;" (3) the transmission must be without authorization; and (4) the transmission must cause damage. The elements of a civil claim under subsections 1030(a)(5)(B) and (C) are slightly different. Under subsection 1030(a)(5)(B), the elements are as follows: (1) the person or entity must intentionally access a computer; (2) the computer must be a "protected computer;" (3) the access must be without authorization; and (4) the access must recklessly cause damage. The elements under subsection 1030(a)(5)(C) are identical those of subsection 1030(a)(5)(B), except the access only needs to have occurred, and does not have to have been reckless.[9]

---

**8.** NHCD urges the court to adopt the reasoning of *Seidl v. Greentree Mortgage Co.,* 30 F.Supp.2d 1292 (D.Colo.1998), in which the court found, applying Colorado law, that a contract e-mailer was an independent contractor, rather than an agent of the e-mailer's customer. This court does not find *Seidl* to be persuasive authority in the present case.

**9.** Proof of recklessness in subsection (B) has significance in criminal cases brought under the CFAA. A conviction under subsection B carries a five-year penalty for a first offense, while a conviction under subsection C carries a one-year penalty for a first offense. 18 U.S.C. § 1030(c)(2)(A) and (3)(A). Because the present case is a civil action, to the extent subsection (B) requires more proof than subsection (C), AOL could elect to proceed only under subsection (C), and obtain the same relief without proof of recklessness. In any event, the court finds NHCD's e-mailers all

The court previously addressed the elements of a civil claim under section 1030(a)(5) in some detail. *See America Online*, 121 F.Supp.2d at 1272–76. There is no dispute that NHCD's e-mailers intentionally accessed AOL's computers, and intentionally caused the transmission of information. The court previously held AOL's computers were "protected computers" for purposes of the CFAA. *See America Online*, 121 F.Supp.2d at 1272. Therefore, the first two elements of AOL's claim under subsections 1030(a)(5)(A), (B) and (C) have been established.

In its prior order, the court left open the question of whether NHCD's e-mailers' access was "without authorization." *See id.* at 1273. The evidence presented at trial failed to clear the murky water sufficiently to see the answer to this question. However, the court finds it unnecessary to resolve the issue for purposes of determining NHCD's liability. The evidence supports the court's preliminary conclusion that "the elements of a claim under subsection [1030](a)(2)(C) have been met, to-wit: (1) NHCD's e-mailers 'intentionally accesse[d] a computer'; (2) they 'exceed[ed] authorized access' by violating the Terms of Service; (3) as a result, they obtained information; (4) the information was obtained from 'a protected computer'; and (5) their conduct involved an interstate or foreign communication." *Id.* at 1276. Therefore, the court must turn to the issue of whether NHCD's UBE caused the requisite damage to AOL to establish a violation of the statute.

"Damage" is defined by the CFAA as "any impairment to the integrity or availability of data, a program, a system or information that .... causes loss aggregating at least $5,000 in value during any 1–year period to one or more individuals;...." 18 U.S.C. § 1030(e)(8)(A). The

court previously ruled the UBE sent by NHCD's e-mailers to AOL members impaired "the integrity or availability of data, a program, a system or information." *See America Online*, 121 F.Supp.2d at 1273–74. However, the court held open the question of whether NHCD's UBE caused the requisite loss of at least $5,000 in value during any one-year period. Based on the record developed at trial, the court now finds NHCD's UBE caused a loss to AOL of at least $5,000 during 1997, 1998, and 1999. Even though NHCD's UBE was only a small fraction of the UBE sent to AOL members during the relevant time period, AOL proved at trial that it was a quantity of UBE sufficiently large to cause AOL to suffer a substantial loss, in an amount exceeding $5,000 in each of the years in question. Accordingly, the court now holds AOL is entitled to recover on this claim.

### C. AOL's Claim of Civil Conspiracy

 AOL argues NHCD was involved in a conspiracy with its contract e-mailers, among others, to violate the CFAA, VCCA, and commit trespass to chattels. AOL correctly sets forth the elements of civil conspiracy as applied in the State of Virginia, to-wit: two or more persons engaged in concerted action either to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means, and resulting in damages. *See Commercial Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 453 S.E.2d 261 (1995). However, because the court has found the contract e-mailers were acting as NHCD's agents, AOL's civil conspiracy claim must fail because a principal and its agents are, for this purpose, not separate entities. *See Perk v. Vector Re-*

were at least reckless with respect to any

damages they caused.

*sources Group, Ltd.*, 253 Va. 310, 485 S.E.2d 140 (1997).

### D. Damages and Other Relief

■ To summarize the claims giving rise to damages, the court has held NHCD is liable for the acts of its contract e-mailers. *See* Section IV.A., *supra.* The court held in its summary judgment order that a trespass to AOL's chattels occurred. *See America Online*, 121 F.Supp.2d at 1277. The court also held previously that NHCD's e-mailers violated the VCCA. *Id.*, 121 F.Supp.2d at 1276–77. Finally, the court has held NHCD's e-mailers violated the CFAA. *See* Section IV.B., *supra.* These are the claims giving rise to damages. However, AOL is not entitled to recover duplicative damages on multiple theories arising from identical conduct; it may only recover damages once for the conduct, even though the conduct may meet the criteria for recovery under several theories.

■ There are two different approaches to the calculation of damages. Under the first approach, AOL would be compensated for the actual cost of delivering each piece of UBE sent by NHCD to AOL members. Under the second approach, AOL argues it is entitled to be paid for each piece of UBE at the rate an advertiser would be charged for a "banner" advertisement displayed on AOL members' e-mail "in boxes." Both of these approaches require a determination of the number of e-mail messages sent on NHCD's behalf to AOL members over the time period relevant to the lawsuit. The court has found this number to be 135 million. *See* Section III, text accompanying notes 8 and 9, *supra.*

Damages under the first approach would be easy to calculate. AOL has submitted uncontroverted evidence that its cost for delivering each piece of e-mail sent to an AOL member is $.00078 (*i.e.*, 78¢ per thousand pieces of e-mail). This would result in damages to AOL of $105,300.00 ($.00078 times 135,000,000). AOL argues damages in this amount would result in a windfall to NHCD because the value of the benefit received by NHCD from its wrongful appropriation of AOL's computer resources would far exceed the actual cost of NHCD's wrongful acts to AOL.

Under the second approach, AOL would receive damages based on its advertising rates for banner advertisements displayed on members' in-boxes, with each e-mail message sent to an AOL member treated as an "impression" [10] for purposes of calculating the amount due. During the relevant period, the list price for banner advertisements on members' e-mail in-boxes was between $10 and $50 for each thousand impressions (the "CPM" rate), but the weighted average of the actual rates charged was $3.89 CPM. If the three largest "deals of strategic value" are removed from the calculation, the weighted average is increased to $8.56 CPM. AOL urges the court to use this rate in the calculation of damages, arguing special business reasons support the rates charged in those three large transactions that are not applicable in the present case.

The court agrees AOL's damages should not be limited to the amount NHCD's wrongful conduct cost AOL. Such a result would permit NHCD, and others in a similar position, to appropriate the use of AOL's equipment at cost, without compensating AOL for any profit. On the other hand, the court sees significant differences

---

**10.** An "impression" is the presentation of an advertising message to a viewer. Here, when an AOL member opens his or her e-mail in-box, one "impression" would be counted for the banner advertisement being displayed on the in-box at that time.

between the value of a banner advertisement and the value of UBE. Banner advertisements are much larger on a computer screen than incoming e-mail messages. Banners usually are in color, with eye-catching graphics. They often have moving text. They can be linked directly to an advertiser's website, taking the viewer to the site with a single click of the mouse. While AOL stresses the similarities between UBE and banner advertisements, and argues that UBE, in several respects, is actually more valuable than a banner advertisement, the court is not convinced. AOL's own witnesses stressed the almost universal hostility of AOL members to UBE, while the same hostility apparently does not exist as to banner advertisements. Although comparing banner advertisements to UBE might not be an "apples and oranges" situation, it is at least a "grapefruits and oranges" situation—that is, while both banner ads and UBE may be classified as "citrus," one is clearly larger than the other.

█ The court concludes that while an award of 78¢ per thousand pieces of NHCD's UBE sent to AOL members would not adequately compensate AOL for its damages, $8.56 per thousand pieces of UBE would dramatically over-compensate AOL. Because there has been no showing that the messages cost AOL anything more than the fixed cost of 78¢ per thousand messages,[11] a rate of $8.56 would represent a nearly 1100 percent profit. This would be excessive.

Considering all of the circumstances, the court finds a rate of $2.50 per thousand pieces of UBE is appropriate. Using this rate, the court finds AOL's actual damages are $337,500.00.[12] This is an appropriate amount both to charge NHCD and to compensate AOL for the NHCD's e-mailers' use of AOL's computer system. It also is approximately the same amount NHCD paid to its e-mailers for the leads produced from UBE sent to AOL members, which supports the court's conclusion that it is a fair and reasonable amount.

The court further finds the $337,500.00 in damages must be reduced by $18,000.00, representing the pro rata share of the funds received by AOL from Forrest Dayton in settlement of AOL's claims against him.[13] Therefore, the court awards AOL **actual damages of $319,500.00.**

The court awards **prejudgment interest on the actual damages from December 18, 1998,** at the rate applicable to judgments in federal court. The court also awards attorney fees, in an amount to be determined after post-trial submissions by the parties.[14]

---

11. Although the 78¢ cost per thousand only reflects AOL's fixed costs, and includes nothing for its variable costs, nothing in the record establishes the amount of any such variable costs. AOL also argues UBE upsets its members and therefore costs AOL business, but again, nothing in the record quantifies any such costs.

12. $2.50 times 135,000,000 divided by 1000.

13. Dayton received $1.2 million from his customers for sending UBE to AOL members, and this is the amount of the settlement between Dayton and AOL. Eighteen percent of the $1.2 million Dayton received from his customers (i.e., $211,000) was received from NHCD. AOL has collected approximately $100,000 from Dayton on this settlement. Thus, an $18,000 credit (18% of $100,000) against AOL's damages is appropriate. See Va.Code Ann. § 8.01–35.1(A)(1); *Tazewell Oil Co. v. United Virginia Bank/Crestar Bank,* 243 Va. 94, 115, 413 S.E.2d 611, 622 (1992); *Thurston Metals & Supply Co. v. Taylor,* 230 Va. 475, 483, 339 S.E.2d 538, 543 (1986).

14. AOL is to file its request for attorneys fees and costs, in compliance with LR 54.2(a), within fourteen days after the filing of this order. NHCD is to file its response to AOL's request within ten days after the filing of AOL's request.

In addition, the court finds NHCD's actions were willful and wanton, and with conscious disregard for AOL's rights. The court therefore awards AOL **$100,000.00 in punitive damages.**

### V. PERMANENT INJUNCTION

NHCD is enjoined permanently from (1) sending or transmitting, or directing, aiding, facilitating or conspiring with others, whether employees, agents or independent contractors, to send or transmit, any electronic mail message or electronic communication of any kind promoting, advertising, selling, or in any way relating to any products, goods or services sold by NHCD, to or through AOL, its network, or its members; and (2) acquiring, compiling, or transferring AOL member e-mail addresses or e-mail addresses that contain "AOL" in the domain name; and (3) accepting, whether or not in return for compensation, any leads or prospective customer information generated using electronic mail sent or transmitted to or through AOL, its network, or its members.

### VI. CONCLUSION

The court finds for the plaintiff AOL, and directs entry of judgment for AOL and against NHCD, with an award of damages and entry of a permanent injunction, as set forth above.

**IT IS SO ORDERED.**